# UNITED STATES *v.* MISSISSIPPI VALLEY GENERATING CO.

No. 26.   Argued October 19, 1960.—Decided January 9, 1961.

522

*Solicitor General Rankin* argued the cause for the United States. With him on the briefs were *Oscar H. Davis, Howard E. Shapiro* and *Samuel D. Slade.*

*John T. Cahill* and *William C. Chanler* argued the cause for respondent. With them on the brief was *Robert G. Zeller*.

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

We granted certiorari to review the decision of the Court of Claims because the conflict-of-interest problem presented by this case has a far-reaching significance in the area of public employment and involves fundamental questions relating to the standards of conduct which should govern those who represent the Government in its business dealings.

The person with whose activities we are primarily concerned is one Adolphe H. Wenzell, Vice President and Director of First Boston Corporation,[1] which is one of the major financial institutions in the country. At the suggestion of First Boston's Chairman, and subsequently at the request of the Bureau of the Budget, Wenzell undertook to advise the Government and act on its behalf in negotiations which culminated in a contract between the Government and the Mississippi Valley Generating Company (MVG), the respondent herein. The contract called for the construction and operation by the respondent of a $100,000,000 steam power plant in the Memphis, Tennessee, area. Ultimately, the plant was to supply 600,000 kw. of electrical energy for the use of the Atomic Energy Commission (AEC). Before the plant was constructed, but after the respondent had taken some steps toward performing the contract, the AEC, which was the governmental contracting agency, canceled the contract because the power to be generated by the proposed plant

---

[1] The positions held by the various individuals named in this opinion are those which were held at the time the transaction in question occurred.

was no longer needed. The respondent then sued the Government in the Court of Claims for the sums it had expended in connection with the contract.

The Government defended on several grounds, but primarily on the ground that the contract was unenforceable due to an illegal conflict of interest on the part of Wenzell. Specifically, the Government contended that at the time of Wenzell's employment by the Government, it was apparent that First Boston was likely to benefit, and as subsequently developed, in fact, did benefit, from the contract here in question; that Wenzell, as an officer of First Boston, was therefore "directly or indirectly" interested in the contract which he, as an agent of the Government, had helped to negotiate; that he consequently had violated the federal conflict-of-interest statute, 18 U. S. C. § 434; [2] and that his illegal conduct tainted the whole transaction and rendered the contract unenforceable.

A sharply divided Court of Claims rejected all of the Government's defenses and awarded damages to the respondent in the sum of $1,867,545.56.[3]  175 F. Supp. 505.

---

[2] The statute reads as follows:

"Whoever, being an officer, agent or member of, or directly or indirectly interested in the pecuniary profits or contracts of any corporation, joint-stock company, or association, or of any firm or partnership, or other business entity, is employed or acts as an officer or agent of the United States for the transaction of business with such business entity, shall be fined not more than $2,000 or imprisoned not more than two years, or both."

[3] There were four opinions in the lower court. The principal one was written by Judge Madden of the Court of Claims, and it was joined by Judges Laramore of the Court of Claims and Bryan, United States District Judge sitting by assignment. Judge Bryan also wrote a concurring opinion. MR. JUSTICE REED (retired), sitting by assignment, wrote a dissenting opinion which was joined by Judge Jones, Chief Judge of the Court of Claims. Judge Jones also wrote a separate dissent.

Because of the view which we take of the conflict-of-interest question, it will not be necessary for us to determine the validity of the other defenses raised by the Government in the court below, important though they may be.[4]  With regard to the conflict-of-interest defense, there appear to be but two legal principles involved: (1) Did the activities of Wenzell constitute a violation of 18 U. S. C. § 434; and (2) if so, does that fact alone preclude the respondent from enforcing the contract?  For reasons which we shall set forth in detail below, we think that the Court of Claims was in error and that both of these questions must be answered in the affirmative.

I.

Because the outcome of this case depends largely upon an evaluation of Wenzell's activities on behalf of the Government, a rather detailed statement of the facts is necessary in order to understand fully the nature of those activities and to place them in their proper context.  The voluminous evidence in the case was heard by a trial commissioner.  Based upon the commissioner's report and the briefs and arguments of counsel, the Court of Claims made very extensive findings of fact which cover approximately 200 pages in the transcript of record.  Fortunately, it will

[4] The other defenses raised by the Government were:

(1) That the AEC had not been authorized by the Atomic Energy Act of 1954 to make the contract;

(2) That the contract had not been placed before the Joint Committee on Atomic Energy in the manner required by the Atomic Energy Act;

(3) That the financing agreements required by the contract violated the Public Utility Act of 1935;

(4) That the respondent had not obtained all of the regulatory approvals required for it to arrange the financing necessary for performance of the contract; and

(5) That the power contract was void for lack of mutuality.

not be necessary for us to consider the original evidence, since both parties have agreed to rely upon the Court of Claims' findings, and since we also conclude that those findings are sufficient to dispose of the issues presented. However, it should be noted that our reliance upon the findings of fact does not preclude us from making an independent determination as to the legal conclusions and inferences which should be drawn from them. See *United States* v. *Du Pont de Nemours & Co.,* 353 U. S. 586, 598; *Great Atl. & Pac. Tea Co.* v. *Supermarket Equip. Corp.,* 340 U. S. 147, 153–154.

*First.* At the outset, we think it is appropriate to discuss, in a general way, the origin of the contract here in question and the negotiations which led to the ultimate agreement. The story of this contract begins in the early days of 1953. Almost immediately after assuming office, President Eisenhower announced his intention to revise the Government's approach to the public power question. In his first State of the Union Message, delivered on February 2, 1953, the President indicated that it was his intention to encourage either private enterprise or local communities to provide power-generating sources in partnership with the Federal Government. Consonant with this policy, Joseph M. Dodge, Director of the Bureau of the Budget, decided in the fall of 1953 to eliminate from the Tennessee Valley Authority's (TVA) budget for the fiscal year 1955 a request for funds to be used for the construction of a steam-generating plant at Fulton, Tennessee. The proposed TVA plant was to have served the commercial, industrial, and domestic power needs of the City of Memphis and its environs. When Gordon Clapp, the General Manager of TVA, learned of Dodge's decision, he immediately informed persons working in the Bureau of the Budget that if provision for the Fulton plant were eliminated from TVA's budget, TVA would take the

position that the amount of power then being supplied by TVA to the AEC should be reduced so that sufficient power would be available to meet the growing demands of TVA's other customers. As a result of this statement by Clapp, the Bureau of the Budget began drafting a statement for the President's budget message to the effect that steps would be taken to relieve TVA of some of its commitments to the AEC, and that if efforts in that direction proved unsuccessful, the possibility of the construction of a plant by TVA at Fulton would be reconsidered.

On December 2, 1953, Dodge met in his office with Lewis I. Strauss, Chairman of the AEC, and Walter J. Williams, General Manager of the AEC. Dodge said that he hoped to avoid further expenditures by TVA for the construction of power-generating plants, and that he thought the AEC should investigate the possibility of reducing its consumption of TVA-generated power by contracting with private industry for the construction of a plant that would supply 450,000 kw. of additional power for the AEC at its Paducah, Kentucky, installation by 1957. Dodge inquired whether the plan outlined by him would be feasible, and Williams replied that he could not answer the question until he had consulted with J. W. McAfee, the President of Electric Energy, Inc., a private utility company which had previously entered into long-term power contracts with the AEC similar to the one described by Dodge.

After the meeting, Williams arranged to meet with McAfee, and this meeting occurred on December 8, 1953. Williams asked McAfee whether he knew of a private power company that might be interested in building a plant to supply the AEC with as much as 450,000 kw. of generating capacity by the middle of 1957. McAfee stated that it might be difficult for his company to do the

job, but he agreed to make some inquiries about the matter. Later, on December 14, 1953, McAfee wrote a letter to the AEC indicating that he thought a group of private investors could be formed to supply the AEC the amount of power requested. Because of the Budget Bureau's continuing interest in the progress of the plan, a copy of McAfee's letter was requested by and sent to William F. McCandless, Assistant Director for Budget Review in the Bureau.

Sometime prior to December 14, 1953, Edgar H. Dixon, President of Middle South Utilities, learned from McAfee that the AEC might be seeking an additional source of power in the Paducah area. On December 23, 1953, Dixon came to Strauss' office for a meeting with Williams, Strauss, and Kenneth D. Nichols, who had been selected to succeed Williams as General Manager of the AEC. The purpose of the meeting was to discuss the possibility of having private utility companies build additional generating capacity near Paducah for the purpose of relieving TVA of its commitments to the AEC there. Shortly after the meeting had concluded, Williams called McCandless at the Bureau of the Budget to inform him of what had transpired at the meeting. On the next day, December 24, 1953, Rowland Hughes, Assistant Director of the Bureau of the Budget, wrote to Strauss, stating that it would be helpful if the AEC would continue negotiations with private power interests with a view toward reaching a firm agreement for the supply of power to the AEC at Paducah.

On January 4, 1954, McAfee wrote a letter to Williams in which he expressed some doubts about the plan suggested by the Government. He thought that it might be wiser for TVA to reduce its commitments to the numerous municipalities which it supplied with power, or for TVA to arrange with neighboring power companies to buy power from them. Shortly after Williams received this

letter, a meeting was held in Strauss' office, and those present were Strauss, Williams, Nichols, Hughes, and McCandless. Nichols, speaking for the AEC, expressed a certain reluctance to continue the negotiations. He pointed out that if the AEC purchased more power from private utilities in lieu of the power already being supplied by TVA, the cost to the AEC would be greater and the supply less certain because of possible delays in the construction of the plant and the location of reserve power. He also noted that McAfee was apparently no longer eager to enter into the contract; that from an engineering point of view, Paducah was a poor location for the site of the new plant; and that if more power was needed in the Memphis area, it would be better for the City of Memphis or for TVA to enter into a contract with private companies for the construction of a plant at that location. McCandless requested that the AEC pursue the matter at greater length with McAfee.

Pursuant to this request, a meeting was arranged for January 20, 1954, between McAfee and Dixon and representatives of the Budget Bureau and the AEC. At the meeting it was made clear to Dixon and McAfee that the purpose of the power plant was to relieve the pressure on TVA in the Memphis area by reducing its commitments to the AEC. The discussion therefore turned to the possibility of constructing the plant at Memphis rather than at Paducah. Dixon suggested that since the power would be supplied directly to TVA, it might be better for TVA, rather than for the AEC, to act as the contracting agency. However, the government representatives preferred that the AEC contract and pay for the power, even though the actual delivery of power would be made to TVA. It was finally agreed that Dixon would prepare a study of the cost factors pertaining to the construction by his company of a power plant that could supply 450,000 to 600,000 kw. of power in the Memphis area.

When it became apparent that the new plant was to be located at Memphis, McAfee lost interest in the project because the location was far removed from the pool area of the companies in which he was interested. Dixon therefore proceeded on his own to draft an initial proposal. During the period in which Dixon was preparing his proposal, he kept in close contact with several government officials, especially Wenzell. The nature and scope of these associations will be discussed below.

On February 19, 1954, Dixon met with Eugene A. Yates, Chairman of the Board of the Southern Company, a public utility holding company. Dixon's purpose in calling this meeting was to persuade Yates that Southern should join Middle South in building the proposed power plant. The next day Yates notified Hughes at the Bureau of the Budget and Nichols at the AEC that Southern had decided to join in the venture.

On February 25, 1954, Dixon and Yates (hereinafter referred to as the sponsors) submitted their proposal to the AEC. They offered to form a new corporation (MVG) which would finance and construct generating facilities from which 600,000 kw. of electrical power would be delivered to TVA in the Memphis area for the account of the AEC. We do not think it is necessary to relate the details of the proposal. Suffice it to say that after a comprehensive joint analysis by TVA and the AEC, the Government decided that the cost estimates contained in the proposal were too high. In fact, the analysis showed that the proposal would cost over seven million dollars more per year than the proposed TVA plant at Fulton would have cost. At the sponsors' request, another analysis was made by Francis L. Adams, Chief of the Bureau of Power, Federal Power Commission. Adams confirmed the conclusions of the AEC and TVA, and said that the figures in the proposal were much higher than a reasonable estimate of costs to the sponsors should require.

By March 24, 1954, it became apparent to the sponsors that their initial proposal was unacceptable to the Government. Therefore, they worked from March 26 to April 1, 1954, to draft a proposal which would be more agreeable to the Government. This second proposal was ultimately submitted to the AEC on April 12, 1954. An intensive joint analysis was again made by the AEC and TVA. Although the findings of fact do not specifically indicate wherein the second proposal differed from the first, the second proposal was more to the Government's liking, and the analysts suggested that it could be a basis for the negotiation of a final contract. On April 24, 1954, Hughes sent President Eisenhower a memorandum reporting the results of the analysis and recommending that the Budget Bureau be authorized to instruct the AEC to conclude a final agreement. On June 16, 1954, the President authorized AEC to continue negotiations with the sponsors and to attempt to consummate an agreement based generally upon the terms of the second proposal.

The negotiation of the final contract began on July 7, 1954, and concluded with the signing of the contract on November 11, 1954. The Government was represented by a "competent and aggressive staff of negotiators." [5] Although the final contract was slightly different from the second proposal, in a general way, it was within the terms of that proposal. The contract became effective on December 17, 1954.

In June 1955, after the respondent had taken some preliminary steps toward performance of the contract,[6] the

---

[5] Any quoted material in the statement of facts is taken from the Court of Claims' findings of fact.

[6] Those steps consisted of undertaking initial action toward financing the project, attempting to obtain the regulatory approvals required under the terms of the contract, taking options on land which was to be the site of the plant, and letting some of the basic construction contracts.

sponsors learned that President Eisenhower had requested the Bureau of the Budget, the AEC and TVA to consider whether the contract should be terminated because in the interim the City of Memphis had decided to construct a municipal power plant, thereby obviating the need in that area for TVA-generated power. On July 11, 1955, the sponsors were informed by the Chairman of the AEC that the President of the United States had decided to terminate the contract. During the months that followed, representatives of the sponsors and of the AEC attempted to agree upon a mutually acceptable basis for terminating the contract. On November 23, 1955, after protracted congressional debate concerning the propriety of Wenzell's activities on behalf of the Budget Bureau, the AEC advised the sponsors that, upon the advice of its counsel, it had reached the conclusion that the contract was not an obligation which could be recognized by the Government. This suit for damages was then initiated.

*Second.* Having sketched the general background of this litigation, we think it is now appropriate to set forth in some detail a description of Wenzell's connection with the Government and of the role he played in the negotiations, for it is these activities on behalf of the Government, as well as his affiliation with First Boston, which constitute the basis for the Government's assertion of a conflict of interest.

Wenzell's first contact with the Government actually antedates any of the negotiations relating to the contract here in question. However, his earlier association with the Government does have a bearing on the issues with which we are primarily concerned, and we shall therefore advert briefly to that phase of Wenzell's activities. In May 1953, George D. Woods, Chairman of First Boston, met with Dodge at the latter's office in the Bureau of the Budget. Woods expressed his agreement with the Administration's newly announced policy of reducing the

Government's participation in business activities, and he offered the services of himself and his firm in any way that might help to achieve the Administration's objective. Dodge replied that he was interested in having some studies made on the amount of subsidy that TVA was receiving from the Federal Government. Dodge indicated that he had not been able to find the right person to conduct these studies, and he asked Woods if he could suggest someone. Woods replied that First Boston did have a man who had worked on many utility financing transactions and who would be qualified to do the work described by Dodge. The man referred to was Wenzell. Woods promised that he would endeavor to make Wenzell's services available for the special project described by Dodge. At the time, Wenzell was a vice president of First Boston and one of its directors. He had been with the firm since its inception in 1934 and before that with its predecessor since 1923. He owned stock in First Boston, although the stock was in his wife's name.

Upon returning to New York, Woods conferred with Wenzell and with other executives of First Boston. Wenzell indicated his willingness to take the job, and none of the other men consulted had any objection. A meeting between Dodge and Wenzell was therefore arranged for May 15, 1953. At the meeting, it was agreed that Wenzell would serve as a part-time consultant to the Bureau, spending one or two days a week in Washington until the project was completed. Wenzell was to receive no compensation from the Government, but he was to be given $10 per day in lieu of subsistence plus transportation expenses. It was understood that he would neither resign his position with First Boston nor relinquish any part of his regular salary or yearly bonus based on the business which he brought to the firm.

Wenzell's task was to make a financial analysis of TVA for the purpose of estimating the amount and source of the

subsidy given to TVA by the Government. Wenzell began his work for the Bureau on May 20, 1953, and his final report was submitted on September 20, 1953. During his four months with the Government, Wenzell was made privy to a vast quantity of data, much of it confidential, contained in the TVA files. Wenzell's final report was generally favorable toward TVA's technical operations, although it suggested that some of TVA's internal accounting systems should be revised and that its service area should not be expanded. The report also contained many unsolicited recommendations to the effect that future demands for power in areas supplied by TVA should be met by private or municipal power plants rather than by an expansion of TVA's facilities. When the report was delivered to Dodge, he read it briefly and was surprised to see that Wenzell had included in the report these recommendations, which had not been requested. Subsequently, after Wenzell had severed his connection with the Bureau, he showed a copy of his report to Woods, although Dodge had expressly admonished Wenzell that the report was a confidential document and should be shown to no one.

Wenzell's next contact with the Government came in January 1954, shortly after the Bureau had commenced the above-described preliminary negotiations with McAfee and Dixon. At the request of Hughes, Wenzell came to Washington on January 18, 1954, to confer on the possibility of his returning to the Bureau on a part-time basis to assist in the negotiations with Dixon. The decision to call upon Wenzell's talents was made by Dodge and Hughes, for it was thought that Wenzell's knowledge of TVA, based upon the analysis theretofore made by him, and of commercial transactions generally would be of great value during the negotiations. At the meeting, Hughes informed Wenzell of the Government's intention to arrange for the construction of a privately owned

power plant near Memphis. Wenzell was also told about the exploratory negotiations which had taken place in December 1953 between the AEC and McAfee and Dixon. Wenzell's chief responsibility was to act as a consultant in the technical area of interest costs for any financing that would have to be undertaken in connection with the contract. Again, as in 1953, Wenzell was not asked to sever his connection with First Boston, and he did not do so. At the close of the meeting, Wenzell informed Hughes that he knew both Dixon and McAfee and that in 1948, or 1949, he had talked to Dixon in connection with services that First Boston proposed to render to one of Dixon's companies. Hughes asked Wenzell to attend a forthcoming meeting between the AEC and Dixon and McAfee. "Hughes emphasized the need for great speed on the project," and he asked Wenzell "to use such influence as he had with the private utility people to impress upon them the need for prompt action on the matter."

At the request of Hughes, Wenzell went to the AEC on the afternoon of January 18, 1954, to confer with Strauss. Strauss acquainted Wenzell with the purpose of the meeting scheduled for January 20, and impressed upon Wenzell the necessity for prompt action. On the following day, Wenzell called Dixon and told him that he would be present at the January 20 meeting as a representative of the Budget Bureau and that Dixon should not be surprised when he saw Wenzell at the meeting.

As prearranged, Wenzell attended the January 20 meeting, and he was the only representative of the Budget Bureau there. However, he did not come to the meeting unescorted. "On his own volition and without consulting any representative of the . . . [Government] or of First Boston, Wenzell took with him Paul Miller, an assistant in First Boston's buying department." The meeting lasted for several hours and the drift of the discussion has been

described above. At the close of the meeting, Dixon said that he would begin investigating the feasibility of the type of contract desired by the Government, and it was agreed that Wenzell would talk to Tony Seal of Ebasco, an engineering firm which serviced Dixon's projects.

Wenzell returned to New York after the meeting, but, before he left, Hughes "requested Wenzell to stay in touch with Dixon and his associates on the development of a proposal and particularly to help point up the real cost of money to be used in financing the project." On January 21, 1954, Wenzell conferred with Seal. He informed Seal of what had happened in Washington and instructed him to begin a study of the proposed project. Seal met with Wenzell again on January 27, 1954, and the former described his progress on the study he was making. "Wenzell stated that he was at . . . [Seal's] service as a representative of the Bureau of the Budget on the all-important matter of the cost of interest on money that would be borrowed to finance the construction of the plant."

Wenzell went to Washington on February 4, 1954, to inform Hughes of what had transpired at his meetings with Seal. He met Dixon in Washington, and the two men flew to New York together that evening. During the flight, Dixon "asked Wenzell to do him a personal favor and ascertain the opinion of First Boston on what the interest rates in the then current money market would be for financing a project similar to the OVEC project." [7]

[7] OVEC stands for the Ohio Valley Electric Corporation, which is a generating company composed of several private utility companies. In 1952, OVEC had contracted with the AEC to supply it with power at its Portsmouth, Ohio, installation. The Portsmouth project required a large amount of financing, and First Boston had been retained to handle the arrangements. First Boston was still engaged in its Portsmouth undertaking when Wenzell first came to the Bureau of the Budget in 1953.

On February 5, 1954, Wenzell met with other executives of First Boston in an attempt to obtain the information requested by Dixon. After Wenzell thought he had found the answer to Dixon's question, he called Dixon and advised him of the information he had acquired from his colleagues at First Boston. During the week that followed, Wenzell made further studies and engrafted certain refinements onto his calculations. Then, on February 14, 1954, he attended a meeting in Dixon's office and gave Dixon the new figures which he had computed.

After McAfee dropped out of the negotiations because of the proposed site of the new plant, Dixon began to search out support from other quarters. One of those from whom he sought assistance was Yates. Dixon arranged a meeting with Yates on February 19, and he requested Wenzell, who had known Yates for several years, to be present. The meeting occurred as scheduled, and Wenzell was the only representative of the Government present. As indicated, Yates agreed to join the project on February 20, 1954.

During his next trip to Washington on February 23, 1954, Wenzell drafted a letter to Dixon giving his opinion as to the cost of money. The information in this letter conformed to the oral opinion which Wenzell had rendered on February 14, 1954. The letter was on First Boston stationery and was signed by Wenzell as an officer of First Boston. Two days later, on February 25, 1954, the sponsors submitted their first proposal. The proposal contained only one reference to the cost of money, and that paragraph read as follows:

> "We have received assurances from responsible financial specialists expressing the belief that financial arrangements can be consummated on the basis which we have used in making this proposal and under existing market conditions, and our offer is conditioned upon such consummation."

The "responsible financial specialists" upon which the sponsors relied were Wenzell and his colleagues at First Boston, and the cost data upon which they conditioned their proposal was that which was contained in the opinion letter drafted by Wenzell.

Wenzell did not participate in the initial study of the sponsors' proposal, but on March 1, 1954, he attended a Budget Bureau staff meeting which had been called for the purpose of completing the review of the proposal. Wenzell brought with him to this meeting Powell Robinson, an assistant vice president of First Boston's sales department. Wenzell, who by March 1 had completed his function as a consultant on the cost of money, now assumed the role of a consultant on the total cost of the project. His initial reaction was that the cost estimates contained in the first proposal were too high. When it became apparent that Wenzell could not answer all of the technical questions relating to engineering costs, Wenzell decided to call Seal down from New York. Seal arrived on the following day and the meeting was continued. As it turned out, Seal was also unable to answer all the questions asked by staff members, and Hughes was advised that, despite Wenzell's insight into the problem, there still remained areas of uncertainty. It was then suggested by a staff member that a joint AEC–TVA analysis be made. Immediately after Hughes made his decision, Wenzell informed Seal that such an analysis was to be made.

On March 9, 1954, a meeting took place at the Bureau of the Budget. The joint AEC–TVA analysis was discussed, and it was the view of all present that the cost estimates were too high. Wenzell was therefore instructed to inform Seal that the sponsors should try to submit a more acceptable proposal. Wenzell conveyed the information to Seal as requested. On the next day, Wenzell arranged a meeting between Duncan Linsley, the Chairman of First Boston's Executive Committee, and

the sponsors. Dixon had requested the meeting so that he could confirm with a reliable source the cost-of-money information previously given him by Wenzell.

On March 15, Wenzell participated in another Budget Bureau meeting which had been called to discuss the final AEC–TVA analysis. In addition to Wenzell, those present at the meeting were the sponsors and Dodge. The sponsors requested that an independent analysis of the proposal be made, and Wenzell suggested that Francis L. Adams, Chief of the Bureau of Power, Federal Power Commission, be requested to make the analysis. As indicated above, this suggestion was subsequently adopted.

On March 16, 1954, several representatives of the sponsors met in Dixon's hotel room to draft a letter replying to the unfavorable conclusions contained in the AEC–TVA analysis. The evidence does not clearly demonstrate whether or not Wenzell was present at this meeting, but the Court of Claims found that Wenzell saw the letter and made several changes on it for the sponsors in his own handwriting. The letter was never sent to the AEC.

On March 23, 1954, Wenzell met with Adams and conferred with him on the proposal and the analysis which Adams was making. While Adams was preparing his analysis, the sponsors were working on some revised estimates. A meeting was called at the Budget Bureau for April 3, 1954, to discuss both Adams' analysis and the sponsors' new estimates. At the meeting, Wenzell once again confirmed the information he had previously given the sponsors on the cost of money. At the conclusion of the meeting, it was decided that the sponsors should undertake to prepare a new proposal in line with their revised estimates. On the afternoon of April 3, Wenzell saw Nichols of the AEC, who said that the sponsors' most recent estimates might prove acceptable. "He suggested that Wenzell encourage the sponsors to refine their figures."

April 3 was the last time that Wenzell came to Washington in his capacity as a consultant to the Bureau. However, the sponsors consulted him from time to time in the preparation of their second proposal, which was dated April 10, 1954, and was submitted to the AEC on April 12, 1954. Wenzell reconfirmed the information which he had previously given the sponsors on the cost of money, and "[t]his information was relied upon by the sponsors in the drafting of the second proposal." The second proposal, like the first, contained a paragraph indicating that the sponsors relied upon Wenzell's advice and conditioned their offer on that advice.

Wenzell took no part in the final negotiations which led to a formal contract based upon the second proposal. The Court of Claims found that Wenzell terminated his association with the Bureau on April 3, 1954; however, Wenzell felt that his relationship with the Bureau ended on the date of the sponsors' second proposal, April 10, 1954. The findings show that Wenzell received a telephone call from Dixon regarding the second proposal as late as April 10, 1954, and that McCandless and Wenzell also had a telephone conversation on that date. Wenzell never tendered either an oral or written resignation; he merely stopped working on behalf of the Bureau.[8]

*Third.* The findings of the Court of Claims make it perfectly clear that the conflict-of-interest question in the case arose many months prior to the time at which the

---

[8] In our rehearsal of the facts, we have necessarily omitted mention of numerous inconsequential meetings and telephone conversations between Wenzell and representatives of the Government and of the sponsors. We make this fact known only to complete the picture and to indicate that Wenzell was continuously involved in the negotiations during his tenure with the Bureau of the Budget. It should also be noted that Hughes was aware of most of Wenzell's activities, both those which we have described and those which we have not mentioned in detail.

Government concluded that the contract was unenforceable. Those who first showed concern about the duality of Wenzell's interests were the sponsors themselves. Around February 20, 1954, Dixon's counsel, Daniel James, expressed apprehension about the fact that Wenzell was an officer of First Boston and was also an employee of the Budget Bureau. "James felt that if it became necessary to finance the project, First Boston would receive first consideration as financial agent because of its experience on the OVEC project. Therefore, James told Dixon that since Wenzell was an officer of First Boston and was also employed by the Budget Bureau, a difficult situation might be created if Dixon should subsequently ask First Boston to handle the financing of the project." James thought that the public power advocates would "make it appear that there was a taint of illegality" attached to the project. As a result of his discussion with James, Dixon later spoke to Wenzell about the "embarrassment" that might result if First Boston were to be retained as financial agent. Dixon suggested that Wenzell talk to his superiors at the Budget Bureau about the situation.

On February 23, 1954, Wenzell followed Dixon's advice and spoke to Hughes about the matter of duality. He alluded to the fact that he had given the sponsors an opinion letter on the probable cost of money for financing the project, and that First Boston was the source of the information given to the sponsors. "He then pointed out to Hughes that if it later developed that First Boston should be asked to handle the financing for the sponsors and should give them a letter similar to Wenzell's draft, the facts that he had been the instrumentality for obtaining the interest figure from First Boston, had given the figure to the sponsors, and had used the same figure in his draft could cause criticism against and embarrassment to the Administration, in that it could be charged

that he, as a First Boston officer and while employed as a special consultant to the Bureau of the Budget, had improperly used his position in the Bureau to obtain business for First Boston." Hughes replied that he thought Wenzell was exaggerating the problem, but he nevertheless advised Wenzell to discuss the matter with his associates at First Boston, with his counsel, and ultimately with Dodge.

Wenzell returned to New York on February 23, 1954, and spoke to James Coggeshall, President of First Boston. Coggeshall thought that the matter was important and suggested that First Boston's counsel, Sullivan and Cromwell, be consulted. Arthur Dean, the partner in the firm who generally handled First Boston's business, was leaving town, and he suggested that Wenzell see John Raben, another member of the law firm. On February 26, 1954, Wenzell met with Raben and described the activities in which he had engaged on behalf of the Budget Bureau. "Raben advised Wenzell that he should terminate his relationship as consultant with the Budget Bureau forthwith and in writing. He also advised that if the proposal was later accepted and First Boston was requested to handle the financing, the board of directors of First Boston should consider whether they wanted to accept the business and, if so, whether they should charge a fee. Finally, he told Wenzell that he should keep Dodge and Hughes informed about any developments in the matter, including any decision which First Boston might later make as to handling the financing of the project." On the same day Raben telephoned Dean, who confirmed the advice which Raben had given Wenzell.

During the days that followed, Wenzell, in conversation, recognized the danger of his dual position, but he did not resign, as he had been advised to do. On one occasion, he was describing his uneasiness to one of his coworkers at the Budget Bureau, and his colleague said

that he thought Wenzell "was 'working both sides of the street' and was likely to get in serious trouble. He suggested that Wenzell's actions were attributable to his lack of familiarity with the restrictions applicable to Government employees as compared with practices in private business." On another occasion in early March 1954, Wenzell told other associates at the Bureau that "he felt that he was in an awkward position in connection with his work on the sponsors' proposal." Then, on March 9, 1954, Wenzell spoke to Dodge about his problem. "Dodge told Wenzell that if there was any likelihood that First Boston might participate in any financing which developed in the future, Wenzell should finish his work with the Bureau as quickly as possible."

In the meantime, both James and Dixon learned that Wenzell had been advised by his counsel to resign immediately. When in early March 1954, James learned that Wenzell had not yet resigned, he asked Hughes why Wenzell had been permitted to continue as a consultant to the Bureau. James expressed the same fears to Hughes that he had earlier expressed to Dixon.

On March 3, 1954, Raben called Wenzell to find out whether the latter had resigned. Wenzell said that he had not resigned, but he assured Raben that he was in the process of doing so. Dean then telephoned Wenzell and told him "to resign promptly and in writing." Dean's concern continued, and on March 10, 1954, he told Raben to call Wenzell again to find out whether he had resigned. Wenzell indicated that he had not as yet resigned, but that he would do so immediately. Consequently, Raben took no further action on the matter. However, as indicated, Wenzell never resigned and did not cease to act for the Bureau until approximately the date on which the second proposal was submitted.

*Fourth.* The final set of facts with which we are concerned relates to the retention of First Boston as the

financing agent for the project. On April 12, 1954, the day on which the second proposal was submitted to the Government, the sponsors met with numerous executives of First Boston, among whom was Wenzell. The sponsors requested a letter confirming Wenzell's information on interest costs. First Boston was also asked to prepare a memorandum on what it thought would be a proper financial plan for the project. At this meeting, Wenzell had discarded his Budget Bureau hat, and had resumed his role as a First Boston vice president. By the time of the meeting, Wenzell "expected that First Boston would handle the financial arrangements for the sponsors if a contract resulted from" the second proposal.

About the middle of April 1954, an executive at Lehman Brothers, another major investment banking firm, learned of the possibility of a contract between the sponsors and the Government. Lehman Brothers thereupon notified the sponsors that it wished to be considered in connection with the financing of the project. Subsequently, in May 1954, Dixon told Woods that if First Boston was to arrange for the financing, it would probably be a good idea for Lehman Brothers also to be associated with the project. Woods was very cool to the idea of Lehman Brothers' participation, and he indicated that he would have to consult his colleagues about it.

On May 11, 1954, Woods told Dixon that First Boston did not wish to share the financing arrangements with Lehman Brothers, and that it might be better for First Boston to withdraw from the project. However, said Woods, if Dixon did not want Lehman Brothers to handle the financing alone, First Boston would be willing to associate with Lehman Brothers "on the conditions that First Boston would have the dominant position so far as authority was concerned and would also have the senior position with respect to advertising and the division of fees." Woods pointed out that in the financial business senior

position as to advertising was a matter of great importance. He felt that First Boston would achieve great prestige were it to arrange for the financing of the project, and that as a result of its activities, First Boston would probably receive other business of the same kind.

Thereafter, First Boston, having already given Dixon a letter confirming Wenzell's information on interest costs, began to prepare a plan for the debt financing. Although Wenzell was not directly responsible for the preparation of the plan, he did assist those who were drafting it. At a meeting on May 18, 1954, the final draft plan for the financing of the project was discussed by the sponsors, First Boston, and Lehman Brothers. The plan called for the direct placement of up to $93,000,000 worth of bonds and up to $27,000,000 worth of unsecured notes. The plan was approved, and it was also decided "that the fee for the financial agents would be divided on the basis of 60 percent to First Boston and 40 percent to Lehman Brothers and that First Boston would have the preferred position on any advertising."

Since no formal agreement of retainer was ever signed, it is difficult to pinpoint the date on which First Boston was actually retained. However, Dixon believed that First Boston had been retained on April 12, when it had been asked to prepare an opinion letter and a memorandum on procedures to be used in financing the project.

Some time in late May 1954, Woods decided that it would be better for First Boston not to charge a fee for its services. The executive committee of First Boston tentatively decided not to accept a fee on July 1, 1954, and that position was formally adopted on October 21, 1954. "The decision not to charge a fee was based on Woods' conclusions that the financing, which First Boston had been retained to handle, had flowed directly from the conversation which Woods had had with Dodge in May 1953, when Woods had offered Wenzell's services to the Budget

Bureau to assist the Administration in connection with its power policy, and that First Boston should not charge a fee for assistance in obtaining funds that were designed to obviate the necessity of Federal expenditures for the expansion of TVA."

As of February 18, 1955, First Boston had made no formal announcement of its decision not to charge a fee; nor had it notified the Government concerning the decision. On that date, Senator Lister Hill of Alabama made a speech criticizing the activities of Wenzell and First Boston and emphasizing Wenzell's conflict of interest.[9] On the next day, Woods released a statement to the press indicating that neither Wenzell nor First Boston had received or would receive any fee for the services rendered in connection with the project. Lehman Brothers had previously indicated that it thought some fee should be charged, and when Woods released the press statement, representatives of Lehman Brothers were upset because they had not been consulted first. Although Dixon had heard that First Boston was contemplating not charging a fee, he did not understand that a final decision on that subject had been made. Even as late as May 5, 1955, Dixon told First Boston that he anticipated questions from the SEC regarding First Boston's fee, and he requested that First Boston give him a clear statement on the matter. In response to this request, First Boston gave Dixon a letter indicating that it would take no fee for the financing services to be rendered in connection with the project. "Dixon was surprised by First Boston's decision not to accept a fee for its services as financial agent. The decision was unusual and without precedent in the history of First Boston." Finally, on May 11, 1955, Lehman Brothers decided that, in view of First Boston's decision, it would also agree not to charge a fee.

---

[9] 101 Cong. Rec. 1714.

Despite the fact that Wenzell had earlier promised to inform Dodge of any agreements between First Boston and the sponsors and to submit those agreements to the Budget Bureau for approval, and despite the fact that First Boston's counsel had advised Wenzell to inform the Budget Bureau of any such agreements, neither Wenzell nor anyone connected with First Boston informed the Budget Bureau of First Boston's retention by the sponsors. The Bureau of the Budget did not learn of First Boston's retention until February 18, 1955. The AEC was informed on July 7, 1954, that First Boston and Lehman Brothers were acting as financial agents for the sponsors. However, "there is no evidence that any representative of AEC had knowledge up to . . . [December 1954] that Wenzell, while serving as a consultant to the Budget Bureau, had been meeting with and supplying information to the sponsors regarding the project."

## II.

As is apparent from a recitation of the facts, this case touches upon numerous matters with which we are not concerned. Therefore, at the outset, we think it is important not only to delineate the issues upon which our decision turns, but also to specify those collateral issues which are not pertinent to our decision. As already indicated, we are interested only in whether Wenzell's executive position with First Boston and his simultaneous activities on behalf of the Government constituted an illegal conflict of interest; and if so, whether the conflict of interest rendered the contract unenforceable. In reaching our decision on these questions, we do not consider and have no interest in the following matters:

(1) The policy of the Administration concerning the relative merits of public versus private power development;

(2) The desire of the respondent and Wenzell and his corporate associates to advance the policies of the Administration;

(3) The employment of so-called "dollar-a-year" men, such as Wenzell, to advise the Government in matters of business, industry, labor, and the sciences; and

(4) The reasonableness or unreasonableness of the contract ultimately negotiated, that not being an issue in the case, and there being no burden on the Government to establish financial loss.

*First.* In determining whether Wenzell's activities fall within the proscription of Section 434, we think it is appropriate to focus our attention initially on the origin, purpose, and scope of the statute. Section 434 is one of several penal conflict-of-interest statutes which were designed to prohibit government officials from engaging in conduct that might be inimical to the best interests of the general public.[10] It is a restatement of a statute adopted in 1863 following the disclosure by a House Committee of scandalous corruption on the part of government agents whose job it was to procure war materials for the Union armies during the Civil War.[11] The statute has since been re-enacted on several occasions,[12] and the broad prohibition contained in the original statute has been retained throughout the years.

The obvious purpose of the statute is to insure honesty in the Government's business dealings by preventing federal agents who have interests adverse to those of the Government from advancing their own interests at the expense of the public welfare. *United States* v. *Chemical*

---

[10] The other statutes are 18 U. S. C. §§ 216, 281, 283, 284, 1914.

[11] Act of March 2, 1863, c. 67, § 8, 12 Stat. 696, 698. See H. R. Rep. No. 2, 37th Cong., 2d Sess., Government Contracts and Appendix.

[12] R. S. § 1783; Act of March 4, 1909, c. 321, § 41, 35 Stat. 1097; Act of June 25, 1948, 62 Stat. 703.

*Foundation,* 272 U. S. 1, 18. The moral principle upon which the statute is based has its foundation in the Biblical admonition that no man may serve two masters, Matt. 6:24, a maxim which is especially pertinent if one of the masters happens to be economic self-interest. Consonant with this salutary moral purpose, Congress has drafted a statute which speaks in very comprehensive terms. Section 434 is not limited in its application to those in the highest echelons of government service, or to those government agents who have only a direct financial interest in the business entities with which they negotiate on behalf of the Government, or to a narrow class of business transactions. Nor is the statute's scope restricted by numerous provisos and exceptions, as is true of many penal statutes.[13] Rather, it applies, without exception, to "whoever" is "directly or indirectly interested in the pecuniary profits or contracts" of a business entity with which he transacts any business "as an officer or agent of the United States."

It is also significant, we think, that the statute does not specify as elements of the crime that there be actual corruption or that there be any actual loss suffered by the Government as a result of the defendant's conflict of interest. This omission indicates that the statute establishes an objective standard of conduct, and that whenever a government agent fails to act in accordance with that standard, he is guilty of violating the statute, regardless of whether there is positive corruption. The statute is thus directed not only at dishonor, but also at conduct that tempts dishonor. This broad proscription embodies a recognition of the fact that an impairment of impartial judgment can occur in even the most well-meaning men when their personal economic interests are affected by the business they transact on behalf of the Government. To

---

[13] See, *e. g.,* 18 U. S. C. §§ 431–433; 15 U. S. C. §§ 1, 13, 13c.

this extent, therefore, the statute is more concerned with. what might have happened in a given situation than with what actually happened. It attempts to prevent honest government agents from succumbing to temptation by making it illegal for them to enter into relationships which are fraught with temptation.[14] *Rankin* v. *United States,* 98 Ct. Cl. 357.

While recognizing that the statute speaks in broad, absolute terms, the respondent argues that to interpret the statute as laying down a prophylactic rule which ignores the actual consequences of proscribed action would be a violation of the time-honored canon that penal statutes are to be narrowly construed. But even penal statutes must be "given their fair meaning in accord with the evident intent of Congress." *United States* v. *Raynor,* 302 U. S. 540, 552; *Rainwater* v. *United States,* 356 U. S. 590, 593; *United States* v. *Corbett,* 215 U. S. 233, 242. In view of the statute's evident purpose and its com-

---

[14] The preventive nature of conflict-of-interest statutes was ably described by the Court of Claims in *Michigan Steel Box Co.* v. *United States,* 49 Ct. Cl. 421, 439:

"The reason of the rule inhibiting a party who occupies confidential and fiduciary relations toward another from assuming antagonistic positions to his principal in matters involving the subject matter of the trust is sometimes said to rest in a sound public policy, but it also is justified in a recognition of the authoritative declaration that no man can serve two masters; and considering that human nature must be dealt with, the rule does not stop with actual violations of such trust relations, but includes within its purpose the removal of any temptation to violate them. . . ."

We have taken a similar view of the evils which flow from contingent fee arrangements for obtaining government contracts. In *Hazelton* v. *Sheckells,* 202 U. S. 71, 79, we said: "The objection to them rests in their tendency, not in what was done in the particular case. . . . The court will not inquire what was done. If that should be improper it probably would be hidden and would not appear." See also *Oscanyan* v. *Arms Co.,* 103 U. S. 261, 275; *Tool Co.* v. *Norris,* 2 Wall. 45, 55.

prehensive language, we are convinced that Congress intended to establish a rigid rule of conduct which, as we shall now demonstrate by analyzing each of the elements of the statutory prohibition, was violated by Wenzell.

The first question is whether Wenzell acted as an "officer or agent of the United States for the transaction of business." Judged by any reasonable test, the facts which we have recited above demonstrate that he was the Government's key representative in the crucial preliminary negotiations between the Government and the sponsors. Because Wenzell was a business acquaintance of both Dixon and Yates, Hughes very early in the negotiations assigned Wenzell the task of using "such influence as he had with the private utility people to impress upon them the need for prompt action." In the weeks that followed, Wenzell kept in constant touch with the sponsors, and frequently was the only representative of the Government at important meetings concerning the project. He participated in intragovernmental analyses; he supplied the sponsors with vital information on the cost of money, and that information was subsequently made the basis for the sponsors' proposals; he urged the sponsors to refine their figures after the initial proposal was rejected; and he was used by the Budget Bureau not only as a consultant on the cost of money, but also as an advisor on the total cost of the project. In fact, Wenzell's activities were so extensive that the Court of Claims was led to the conclusion that "Hughes really used Wenzell as an expediter. . . . He [Wenzell], no doubt, was able to give to Hughes a better overall view of events than any other person, and did, we should suppose, expedite the formulation of the proposal which formed the basis for the later negotiation of details and exact figures." 175 F. Supp., at 514. Considering that Wenzell was the Government's major representative in the formative negotiations of this multimillion dollar contract, we think it

would be unrealistic to say that he was not the type of "agent" to whom Section 434 was intended to apply.

The respondent suggests that Wenzell was not an "agent of the United States" because "[h]e took no oath of office; he had no tenure; he served without salary, except for $10 per day in lieu of subsistence; his duties were merely consultative, were occasional and temporary and were not prescribed by statute; and he was permitted to continue in his position as one of the vice presidents and directors of First Boston and to draw his salary from that company." But surely, these factors cannot be determinative of the question. A key representative of the Government who has taken no oath of office, who has no tenure, and who receives no salary is just as likely to subordinate the Government's interest to his own as is a regular, full-time, compensated civil servant. This is undoubtedly why the statute applies not only to those who are "employed" by the Government, but also to "[w]hoever . . . acts" as an agent for the Government.[15] In addition, we think that the respondent ignores the relevant facts when it characterizes Wenzell's activities as merely "occasional and temporary." During his association with the Budget Bureau, Wenzell, as we have indicated, was as active a participant in the negotiations as anyone connected with the project. We do not think it would be erroneous to characterize him as the real architect of the final contract. Finally, respondent's reliance upon the fact that Wenzell retained his position with First Boston is misplaced. The key role which Wenzell played in representing the Government was in no way diminished by the fact that he retained his association with First Boston during his period of consultancy. It was Wenzell's position with

---

[15] Irregular employees of the Government, whether compensated or not, have always been considered by the Executive Branch to be subject to the conflict-of-interest statutes. See, e. g., 40 Op. Atty. Gen. 168, 289, 294; 41 Op. Atty. Gen. No. 64.

First Boston which constituted the basis for his conflict of interest, and it would truly be anomalous if we were to adopt the respondent's suggestion that the very fact which creates the conflict of interest also operates to remove Wenzell from the coverage of the statute. This would ignore the purpose of the statute.

The respondent also contends that even if Wenzell qualified as an "agent" of the Government, his activities did not constitute "the transaction of business." We disagree. Although it is true that Wenzell had no authority to sign a binding contract, and that he did not participate in the terminal negotiations which led to the final agreement, nevertheless, those facts do not support the respondent's conclusion that the negotiations in which Wenzell participated were too remote and tenuous to be considered "the transaction of business." Far from being tenuous, the negotiations in which he participated were the very foundation upon which the final contract was based. As the findings of the Court of Claims demonstrate, the preliminary negotiations with which Wenzell was concerned dealt primarily with the cost of the project, and particularly with the "all-important matter of the cost of interest on money that would be borrowed to finance the construction of the plant." If the sponsors and the Government had not agreed on the cost of construction and on the cost of money, no contract would have been made, because the cost of power supplied to the AEC was to have been based upon both of those factors. As the Court of Claims found: "It was well known that the cost of money played an important part in the cost of the entire project and in the price at which the energy could be produced and sold. . . . It was always contemplated that the cost of money would be reflected in the capacity charge to the Government, and . . . the cost of money is the largest component of cost included in the capacity charge." The importance of the negotiations between Wenzell and the

sponsors is emphasized by the fact that both the first and second proposals were conditioned upon the sponsors' being able to borrow money at the interest rate specified by Wenzell and First Boston. Although Wenzell did not participate in the ultimate negotiations, those negotiations cannot be divorced from the events which led up to the submission of the second proposal. The final contract was not negotiated in a vacuum. The second proposal, upon which Wenzell had expended so much time and energy, constituted both the framework and the guidelines of the final contract. And although "there were numerous changes in and additions to the terms set forth in the proposal," the Court of Claims specifically found that "[i]n a general way, the contract was within the terms of the proposal."

We therefore think that the respondent unrealistically assesses the facts when it characterizes the negotiations which led to the contract as a series of disconnected transactions. On the contrary, they were a continuous course of dealings which were closely interrelated and interconnected. Wenzell played a key role in the early stages of the negotiations, and it was quite likely that the contract would never have come into fruition had he not participated on behalf of the Government. The Court of Claims recognized the importance of the preliminary negotiations and of Wenzell's activities during those negotiations. It said that "[w]hile the contract itself contained nothing of Wenzell's work, the fact that it was made at all may have been a result of his work." 175 F. Supp., at 514. If the activities of a government agent have as decisive an effect upon the outcome of a transaction as Wenzell's activities were said by the Court of Claims to have had in this case, then a refusal to characterize those activities as part of a business transaction merely because they occurred at an early stage of the negotiations is at war with the obvious purpose of the statute. To limit the application of the

statute to government agents who participate only in the final formation of a contract would permit those who have a conflict of interest to engage in the preliminary, but often crucial stages of the transaction, and then to insulate themselves from prosecution under Section 434 by withdrawing from the negotiations at the final, and often perfunctory stage of the proceedings. Congress could not possibly have intended such an obvious evasion of the statute.

The second question which we must consider in determining whether Wenzell's activities fell within the scope of the statute is whether he was "directly or indirectly interested in the pecuniary profits or contracts" of the sponsors. We think that the findings of the lower court demonstrate that, at the very least, Wenzell had an indirect interest in the contract which the sponsors were attempting to obtain. That interest may be described as follows: Wenzell was an officer and executive of First Boston; he not only shared in the profits which First Boston made during the year, but he also received a bonus for any business which he brought to the firm; if a contract between the Government and the sponsors was ultimately agreed upon, there was a substantial probability that, because of its prior experience in the area of private power financing, First Boston would be hired to secure the financing for the proposed Memphis project; if First Boston did receive the contract, it might not only profit directly from that contract, but it would also achieve great prestige and would thereby be likely to receive other business of the same kind in the future; therefore, Wenzell, as an officer and profit-sharer of First Boston, could expect to benefit from any agreement that might be made between the Government and the sponsors.

The respondent urges that Wenzell had no interest because First Boston had no more than a mere hope that it might receive the financing work were the negotiations

in which Wenzell participated to culminate in a contract. However, the findings of fact and the conclusions of the Court of Claims belie the respondent's assertion. First Boston had arranged the financing on the OVEC project and had acquired a reputation in the area of private power financing. Wenzell had also acquired a certain expertise in this area by virtue of his previous work for the Budget Bureau in preparing the TVA analysis. It was therefore probable that First Boston's services would again be utilized should the sponsors obtain a contract to construct a project similar to OVEC. That this expectation was not baseless is demonstrated by the fact that as early as February 20, 1954, Dixon's counsel expressed apprehension about Wenzell's duality since it seemed likely that First Boston would receive the financing contract. Even Wenzell must have thought very early in the negotiations that First Boston would probably be retained to do the financing, for on February 23, 1954, he told Hughes that should First Boston be retained, he might be criticized for having "improperly used his position in the Bureau to obtain business for First Boston." Wenzell's apprehension was confirmed by First Boston's counsel, who advised Wenzell to resign from the Bureau of the Budget "forthwith and in writing." This advice was undoubtedly premised on the realization that First Boston stood a good chance of receiving the financing contract. The Court of Claims recognized that from the outset there was a "substantial possibility" that First Boston would be retained. It said:

"There was, of course, a substantial possibility that if the Administration's hope that private capital would build the necessary plant should be realized, First Boston, as one of the largest and most experienced firms engaged in arranging the financing of such

enterprises, might be employed by the company which got the contract." 175 F. Supp., at 514.

. . . . .

"He [Wenzell] had an interest in First Boston which company, *by the logic of circumstances,* might be offered the work of arranging the financing of the project when and if a contract for the project should be made." 175 F. Supp., at 515. (Emphasis added.)

It was the "logic of circumstances" referred to by the Court of Claims that placed Wenzell in the ambivalent position at which the statute is aimed. Wenzell, as an agent of the Government, was entrusted with the responsibility of representing the Government's interest in the preliminary stages of a very important contract negotiation. However, because the sponsors were in a position to affect the fortunes of himself and his firm, he was, to say the least, subconsciously tempted to ingratiate himself with the sponsors and to accede to their demands, even though such concessions might have been adverse to the best interests of the Government. By thus placing himself in this ambiguous situation, Wenzell failed to honor the objective standard of conduct which the statute prescribes.

The respondent suggests that Wenzell was never really subject to any temptations because he was not in a position whereby he could have sacrificed any of the Government's interests. Once again, however, the respondent takes an unrealistic view of the facts. We have already described how important a role Wenzell played in this transaction. In fulfilling that role, Wenzell, on numerous occasions, could have taken action that would have favored the sponsors to the detriment of the Government. For example, he could have concurred too easily with the sponsors as to specific items of the proposals or of the cost estimates; or

he could have failed to press the Government's position on items of cost vigorously enough; or he could have suggested acceptance by the Government of a proposal which, for one reason or another, should not have been approved. However, we need not deal exclusively in the realm of conjecture. The findings of the Court of Claims disclose numerous instances in which Wenzell seemed to be more preoccupied with advancing the position of First Boston or the sponsors than with representing the best interests of the Government. For example, after the joint TVA–AEC analysis was made available, Wenzell helped draft a letter which the sponsors planned to submit to the Government as a rebuttal to the unfavorable conclusions contained in the analysis. We should think that one who represented the Government would be more interested in defending the Government's position than in helping the sponsors to attack it. On another occasion, Wenzell performed a "personal favor" for Dixon by obtaining some information on the cost of money from his associates at First Boston. As it later turned out, this information was to constitute the framework around which the sponsors constructed their proposal. By submitting the information to Dixon on the stationery of First Boston, and by subsequently arranging a meeting between the sponsors and some officers of First Boston so that the information could be confirmed, Wenzell was able constantly to keep First Boston in the forefront of the picture.[16] It is therefore not surprising either that the sponsors did choose First Boston to conduct the major part of the financing, or that Woods, the Chairman of First Boston, subsequently thought that "the financing, which First Boston had been retained to handle, had flowed directly from the conversa-

---

[16] That Wenzell, on at least two occasions, brought senior officers from First Boston with him to negotiating sessions is further evidence of the fact that Wenzell frequently attempted to place First Boston in a position of predominance.

tion which Woods had had with Dodge in May 1953, when Woods had offered Wenzell's services to the Budget Bureau to assist the Administration in connection with its power policy." That Wenzell's primary allegiance was to First Boston and that his loyalty to the Government was a fleeting one is shown by the fact that after he had finished his report on TVA in 1953, he showed a copy of that confidential document to Woods, even though he had been expressly told by Dodge to show the report to no one; and by the further fact that when First Boston agreed to do the financing, Wenzell did not keep his promise to Dodge to inform the Budget Bureau of any arrangement between First Boston and the sponsors and to submit that arrangement to the Bureau for approval. It may be true, as the respondent asserts, that none of Wenzell's activities to which we have alluded adversely affected the Government in any way. However, that question is irrelevant to a consideration of whether or not Wenzell violated the statute. As we have indicated, the statute is preventive in nature; it lays down an absolute standard of conduct which Wenzell violated by entering into a relationship which made it difficult for him to represent the Government with the singleness of purpose required by the statute.[17]

---

[17] The fact that First Boston subsequently decided not to accept a fee is irrelevant to a determination of whether Wenzell violated the statute. First Boston's decision was not reached until many months after Wenzell had terminated his connection with the Bureau of the Budget. At the time Wenzell represented the Government, which is the period crucial to our determination, First Boston fully expected to accept a fee for services which it might render, and Wenzell had every reason to expect that he would benefit from any profits that First Boston might make. It was this expectation that infected the transaction, and the taint cannot be removed by a subsequent, unilateral decision on the part of First Boston to forego its fee.

Finally, some mention must be made of certain factors which the Court of Claims cited in reaching the conclusion that Wenzell had not violated the statute. First, both the court below and the respondent intimate that Wenzell could not have expected to benefit from the contract because there was no formal contract or understanding between First Boston and the sponsors to the effect that First Boston would be retained should the sponsors enter into an agreement with the Government. However, we do not think that the absence of such a formal agreement or understanding is determinative. The question is not whether Wenzell was certain to benefit from the contract, but whether the likelihood that he might benefit was so great that he would be subject to those temptations which the statute seeks to avoid. That there was more than a mere likelihood in this case has already been shown. Second, the Court of Claims stressed the fact that Wenzell's goal of advancing the cause of private power coincided with the Administration's general objective. However, that fact cannot serve to exempt Wenzell from the coverage of the statute. In fact, the more evidence an agent gives of agreement with the policies of the Administration, the more responsibility he is likely to be given, and in case of a conflict of interest, the greater is the possible injury to the Government. Third, the Court of Claims relied strongly on the fact that Wenzell did not think that he was involved in a conflict-of-interest situation. How Wenzell could have thought otherwise following the admonitions of both Dixon's counsel and First Boston's counsel and his own statements in that regard is difficult to understand. However, even assuming that Wenzell did not think there was a conflict, that fact is irrelevant. As we have shown, the statute establishes an objective, not a subjective, standard, and it is therefore of little moment whether the agent thought he was

violating the statute, if the objective facts show that there was a conflict of interest. Finally, both the Court of Claims and the respondent make much of the fact that Wenzell's immediate superiors in the Bureau of the Budget knew of his activities and of his interest in First Boston. True as this fact is, it is significant, we think, that no one in the AEC, which was the governmental contracting agency, and which had expressed reluctance about the contract throughout the negotiations, had knowledge until December 1954 that "Wenzell, while serving as a consultant to the Budget Bureau, had been meeting with and supplying information to the sponsors regarding the project." In any event, the knowledge of Wenzell's superiors and their approval of his activities do not suffice to exempt Wenzell from the coverage of the statute. Neither Section 434 nor any other statute empowered his superiors to exempt him from the statute, and we are convinced that it would be contrary to the purpose of the statute for this Court to bestow such a power upon those whom Congress has not seen fit to so authorize. Congress undoubtedly had a very specific reason for not conferring such a power upon high-level administrators. It recognized that an agent's superiors may not appreciate the nature of the agent's conflict, or that the superiors might, in fact, share the agent's conflict of interest. The prohibition was therefore designed to protect the United States, as a Government, from the mistakes, as well as the connivance, of its own officers and agents. It is not surprising therefore that we have consistently held that no government agent can properly claim exemption from a conflict-of-interest statute simply because his superiors did not discern the conflict. *Ewert* v. *Bluejacket,* 259 U. S. 129; *Prosser* v. *Finn,* 208 U. S. 67.

The thrust of the arguments made by the respondent and adopted by the Court of Claims is that it would be

unjust to apply the statute to one who acted as Wenzell did in this case. We cannot agree. The statute is directed at an evil which endangers the very fabric of a democratic society, for a democracy is effective only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their appointees engage in activities which arouse suspicions of malfeasance and corruption. The seriousness of this evil quite naturally led Congress to adopt a statute whose breadth would be sufficient to cope with the evil. Against this background, it seems clear to us that Wenzell's duality, which aroused the fears of his own counsel and the suspicions of many observers, was the very type of conflict at which the statute is aimed. That Wenzell was aware of his dual position early in the negotiations; that he was advised by his own counsel to resign "forthwith and in writing"; that he did not terminate his association with the Budget Bureau until the final proposal had been submitted; that he never formally resigned his position with the Bureau, as he had been advised to do; and that his activities fall within the literal meaning of the statute have all been demonstrated. In the light of these circumstances, we think that the respondent's reliance upon the so-called equitable considerations in Wenzell's favor is misplaced.

Because of the respondent's assertion that an application of the statute to Wenzell will make it impossible in the future for the Government to obtain the services of private consultants on a part-time basis, we emphasize that our specific holding, on the facts before us, is that Section 434 forbids a government agent from engaging in business transactions on behalf of the Government if, by virtue of his private interests, he may benefit financially from the outcome of those transactions.

*Second.* Having determined that Wenzell's activities constituted a violation of Section 434, we must next consider whether Wenzell's illegal conduct renders the contract unenforceable. It is true that Section 434 does not specifically provide for the invalidation of contracts which are made in violation of the statutory prohibition. However, that fact is not determinative of the question, for a statute frequently implies that a contract is not to be enforced when it arises out of circumstances that would lead enforcement to offend the essential purpose of the enactment. *E. g., Miller* v. *Ammon,* 145 U. S. 421; *Bank of the United States* v. *Owens,* 2 Pet. 527; 6 Williston, Contracts (rev. ed. 1938), § 1763. Therefore, the inquiry must be whether the sanction of nonenforcement is consistent with and essential to effectuating the public policy embodied in Section 434.

As we have indicated, the primary purpose of the statute is to protect the public from the corrupting influences that might be brought to bear upon government agents who are financially interested in the business transactions which they are conducting on behalf of the Government. This protection can be fully accorded only if contracts which are tainted by a conflict of interest on the part of a government agent may be disaffirmed by the Government. If the Government's sole remedy in a case such as that now before us is merely a criminal prosecution against its agent, as the respondent suggests, then the public will be forced to bear the burden of complying with the very sort of contract which the statute sought to prevent. Were we to decree the enforcement of such a contract, we would be affirmatively sanctioning the type of infected bargain which the statute outlaws and we would be depriving the public of the protection which Congress has conferred.

Nonenforcement of contracts made in violation of Section 434 and its predecessor statutes is not a novel remedy. On at least two occasions the Court of Claims has held that the Government could disaffirm contractual obligations arising from transactions which were prohibited by the statutory antecedent to Section 434. *Rankin* v. *United States, supra; Curved Electrotype Plate Co.* v. *United States,* 50 Ct. Cl. 258. See also *Michigan Steel Box Co.* v. *United States,* 49 Ct. Cl. 421. In reaching its decision in this case, the Court of Claims appears to have abandoned these precedents, and instead placed great reliance upon our decision in *Muschany* v. *United States,* 324 U. S. 49. However, we find no difficulty in distinguishing that case from the instant situation. The *Muschany* case involved a government land agent whose activities not only were authorized by the National Defense Act of 1940, 54 Stat. 712, but also were found by the Court to be outside the purview of the conflict-of-interest statutes. Therefore, unlike this case, *Muschany* did not involve a contract which resulted from an illegal transaction, and it is consequently understandable that the contract there in question was enforced.[18]

The Court of Claims was of the opinion that it would be overly harsh not to enforce this contract, since the sponsors could not have controlled Wenzell's activities and were guilty of no wrongdoing. However, we think that the court emphasized the wrong considerations. Although nonenforcement frequently has the effect of

---

[18] The other cases relied upon by the respondent, *United States* v. *Chemical Foundation,* 272 U. S. 1; *Architects Building Corp.* v. *United States,* 98 Ct. Cl. 368, are also distinguishable on the ground that the activities of the government agents there involved were found by the courts not to constitute a violation of any conflict-of-interest statute. Therefore, since the contracts in those cases had not emanated from an illegal transaction, they were enforced.

punishing one who has broken the law, its primary purpose is to guarantee the integrity of the federal contracting process and to protect the public from the corruption which might lie undetectable beneath the surface of a contract conceived in a tainted transaction. Cf. *Crocker* v. *United States*, 240 U. S. 74, 80–81. It is this inherent difficulty in detecting corruption which requires that contracts made in violation of Section 434 be held unenforceable, even though the party seeking enforcement ostensibly appears entirely innocent. Cf. *Hazelton* v. *Sheckells*, 202 U. S. 71, 79. Therefore, even if the result in a given case may seem harsh, and we do not think that such is the case here,[19] that result is dictated by the public policy manifested by the statute. We agree with Judge Jones' statement that "the policy so clearly expressed in 18 U. S. C. 434 leaves no room for equitable considerations. . . . If that policy is to be narrowed or limited by exceptions, it is the function of Congress and not of this court to spell out such limitations and exceptions." 175 F. Supp., at 533 (dissenting opinion).

In concluding that the sponsors were entitled to enforce their contract, the court below expressed the opinion that the Government may not avoid a bad bargain by relying upon a conflict of interest which was directly caused by high officials in the Bureau of the Budget. Of course, the

---

[19] We do not think that the result in this case is harsh because the sponsors were not as naive regarding the conflict-of-interest question as the Court of Claims implied. They recognized Wenzell's conflict of interest almost from the outset of the negotiations. However, instead of refusing to negotiate with Wenzell or of making it clear both to Wenzell and to all the other interested parties that if Wenzell participated in the negotiations, First Boston would under no circumstances be considered as the financing agent for the project, the sponsors dealt almost exclusively with Wenzell and continually fortified his belief that First Boston would be selected as the financing agent should a contract result from the negotiations.

Government could not avoid the contract merely because it turned out to be a bad bargain.[20] See *Muschany* v. *United States, supra,* at 66–67. However, that is not the issue before us. The question is whether the Government may disaffirm a contract which is infected by an illegal conflict of interest. As we have indicated, the public policy embodied in Section 434 requires nonenforcement, and this is true even though the conflict of interest was caused or condoned by high government officials. The same strong policy which prevents an administrative official from exempting his subordinates from the coverage of the statute also dictates that the actions of such an official not be construed as requiring enforcement of an illegal contract.[21]

Although nonenforcement may seem harsh in a given case, we think that it is required in order to extend to the public the full protection which Congress decreed by enacting Section 434.[22]

The judgment of the Court of Claims is reversed and the case is remanded for further proceedings consistent with this opinion.

*Reversed and remanded.*

---

[20] There is nothing in the findings to show whether the contract here involved was favorable or unfavorable to the Government.

[21] It should be remembered that the contracting agency, the AEC, had virtually no knowledge of the activities which Wenzell was conducting on behalf of the sponsors during his tenure with the Bureau of the Budget. It may well be that had the AEC known of these facts, it would have insisted that Wenzell be precluded from representing the Government, or, at least, would have scrutinized his recommendations more closely.

[22] The respondent also contends that even if the contract is not enforceable, a recovery *quantum valebat* should be decreed. However, such a remedy is appropriate only where one party to a transaction has received and retained tangible benefits from the other party. See *Crocker* v. *United States,* 240 U. S. 74, 81–82. Since the Government has received nothing from the respondent, no recovery *quantum valebat* is in order.

Mr. Justice Harlan, whom Mr. Justice Whittaker and Mr. Justice Stewart join, dissenting.

In a case like this controlling legal issues are apt to become blurred under the urge of vindicating a public policy whose importance no one will dispute. However, we sit here not as a committee on general business ethics, but as a court enforcing a specific piece of legislation.

While I am bound to say that the Government's defense to this claim for out-of-pocket expenses incurred in a matter that the Government was once anxious to explore, is far from ingratiating,[1] I must agree with the Court that Wenzell's government role in connection with the Mississippi Valley contract, though in the view of the Court of Claims it was quite peripheral, was sufficient to constitute him one who "acts as an officer or agent of the United States" within the meaning of 18 U. S. C. § 434,[2] and that if he was personally "indirectly interested" in that contract via First Boston the case must go for the

---

[1] Wenzell's superiors in the Government were fully aware of his connection with First Boston and of the possibility that First Boston might later figure in the financing of the contemplated private power project; and with such knowledge they affirmatively acquiesced, and indeed encouraged, his continuing in his consultative role. The power contract, which the Government recognizes was the product of hard bargaining and implicitly concedes was fair, was eventually terminated only because the Government had lost interest in it. The defense of illegality was raised for the first time in this suit, and only after a political storm had arisen over the public versus private power issue. Nevertheless I think the Court is right in considering that all these factors are rendered immaterial by the statute in question.

[2] "§ 434. *Interested persons acting as Government agents.*

"Whoever, being an officer, agent or member of, or directly or indirectly interested in the pecuniary profits or contracts of any corporation, joint-stock company, or association, or of any firm or partnership, or other business entity, is employed or acts as an officer or agent of the United States for the transaction of business with such business entity, shall be fined not more than $2,000 or imprisoned not more than two years, or both."

Government. But in light of the findings of the Court of Claims I cannot agree that Wenzell was so interested, within the contemplation of § 434. In my opinion this Court's contrary conclusion rests upon too loose a view of the controlling statutory phrase.

Referring to the period of Wenzell's governmental service, the Court of Claims concluded:

> "There is not a shadow of evidence that it [First Boston] had any agreement or commitment, written or oral, formal or informal, contingent or otherwise that, in the event that the proposal [of the Dixon-Yates group] which was in preparation when Wenzell's Government employment ended should result in negotiations which should, in the course of events, result in a contract, First Boston would be given the opportunity to earn a commission by selling the bonds of the corporation [Mississippi Valley] which would be formed to sign and perform the contract. The evidence is perfectly plain that there was no such agreement or understanding." 175 F. Supp., at 518.

I do not understand the Court to take issue with this conclusion or with any of the findings of the Hearing Examiner on which it was based. It could not well do so, cf. *Commissioner* v. *Duberstein,* 363 U. S. 278; nor does the Government ask this. Rather, the Court finds the prohibited "indirect interest" to consist of Wenzell's expectation in the probability that First Boston, by virtue of its reputation in the field of private power financing and its having previously arranged the financing for a similar project, would eventually share in the financing of this venture.

I do not believe that such a probability alone gives rise to a contaminating interest under § 434. The fact that the probability eventuated into actuality after Wenzell's

government service terminated can hardly be relevant, for what the Court, under its view of the statute, correctly says as to the immateriality of First Boston's later waiver of commissions must surely also work in reverse. Whether or not a prohibited interest exists must be determined as of the period during which an individual is acting for the Government. And when the asserted interest arises "indirectly" by way of a subcontract, its existence can, in my opinion, only be found in some commitment, arrangement, or understanding obtaining at that time between the prime contractor and subcontractor.[3] I believe this latter proposition is supported by persuasive considerations.

*First.* It fits the language of § 434, whereas the Court's view does not. The statute does not speak of the disqualifying factors in terms of expectations or probabilities, but imports a precise standard, that is, a present status or pecuniary interest arising from some existing relationship with the business entity contracting with the Government. Certainly this is true as to an "officer," "agent," or "member" of the contracting enterprise. It is equally true of one disqualified by reason of "being . . . directly . . . interested in the pecuniary profits or contracts" of such an entity. I can see no reason why it should not also be true as to one "indirectly" so interested, requiring in this instance proof of some then-existing arrangement between Mississippi Valley and First Boston. I do not mean to suggest that such an arrangement must be evidenced by a formal agreement, for of course any sort of tacit understanding or "gentlemen's agreement" will suffice. But here the Court of Claims has expressly found against the existence of any such thing.

---

[3] Whether absence of knowledge of such an arrangement on the part of the individual concerned would be a defense is a matter not presented by this case.

570

*Second.* The view which I take of the matter also fits the purposes of § 434. The policy and rationale of the statute are clear: an individual who negotiates business for the Government should not be exposed to the temptation which might be created by a loyalty divided between the interest of the Government and his own self-interest; the risk that the Government will not be left with the best possible transaction is too great. In terms of these factors, a finding of some commitment, arrangement or understanding between the prime contractor and the subcontractor should be required when the contracting officer's adverse interest arises by way of a subcontract, since only where some such arrangement exists can the officer be taken to have known that any undue benefit he confers on the prime contractor will not eventually redound to the profit of some other competing subcontractor.

Here, for instance, it was found below that Mississippi Valley "a month after Wenzell's Government employment had terminated . . . felt perfectly free to give the bond-selling business to whomever it pleased." 175 F. Supp., at 518. Hence if Wenzell did in fact confer some undue benefit on Mississippi during the term of his government service (although none is suggested), he must have known that he was conferring that benefit at large, and that if First Boston later were to share in it this would only be the consequence of its having successfully competed against other investment bankers with similar qualifications. Furthermore, where the government officer's eventual indirect participation in the contract which he has negotiated (by hypothesis improperly) depends on the chance of competition after he has lost the leverage which his position gave, then it would be subject to the additional hazard that although the contractor has received a boon at his hands, all the subcontractor receives is such a normal subcontract as he might have had in any case.

*Third.* The Court's interpretation of § 434 introduces unnecessary and undesirable uncertainties into the statute. Instead of presenting the individual concerned or the trier of fact with a definite standard for determining whether a disqualifying interest of this kind is present— the existence *vel non* of a commitment or undertaking between the primary and secondary contractors—the question is left at large. The opinion in this case indeed highlights the matter. For after apparently agreeing that a "mere hope" that First Boston might share in the financing of the power contract would not be enough, the Court goes on to describe that eventuality in a variety of ways—that there was "a substantial probability" of it; that it was "probable"; that "it seemed likely"; that it "stood a good chance" of coming to pass; and that it might simply follow from the " 'logic of circumstances' " as a " 'substantial possibility.' "

Such uncertainty, inherent in the Court's view of the statute, is bound to cause future confusion in an area where the line of demarcation should be clear cut. As time goes on it will face many conscientious persons with the kind of close and subtle niceties which, as every judge and lawyer knows, often attend a matter of possible disqualification. Such illusive factors should not be imported into a statute governing the conduct primarily of laymen serving the Government.

*Fourth.* I think there is affirmative ground in the pattern of conflict-of-interest legislation for not attributing to Congress the purpose which the Court here does. The statute in question is the most general conflict-of-interest enactment, but there are other provisions of law, as well as federal regulations, which also deal with the subject. Particularly 5 U. S. C. § 99 and 18 U. S. C. § 284 indicate a different approach to the problem. The two statutes disqualify former officers and employees of governmental agencies or departments for a period of two years from

prosecuting or aiding in any way in the prosecution of a claim which had been pending at the time of their employment. A similar approach is suggested by this Court's Rule 7 which prohibits clerks and secretaries from practicing before this Court for a period of two years after leaving the Court, and from participating in any way in a case which was before the Court during the term of their employment. Cf. Canon 36 of the Canons of Professional Ethics of the American Bar Association.

The interpretation which the Court today gives 18 U. S. C. § 434, if it is to be taken as more than a disposition of this particular controversy, will go a long way to assimilating that statute in practical effect to the absolute disqualification type of provision, for certainly where criminal sanctions are involved no prudent man will risk later acquiring an interest in a contract which he helped to negotiate during a previous term of government employment. Whether such a rigid rule, of a kind traditional in the legal profession, should also be regarded as one of general morality in the public service may, of course, well be debated. However, Congress did not, in my view, enact this precept into law in the present statute, and where it has enacted this policy it has done so with a clarity and precision which I feel the present reading of § 434 lacks.

I would affirm.