(No. 4878– 

CAM-RECORD Co., INC., A Corporation, Claimant, vs. STATE OF ILLINOIS, Respondent.

Opinion filed November 12, 1963.

RAYMOND E. TRAFELET and GEORGE E. DOLEZAL, and RATHJE, KULP, SABEL AND SULLIVAN, Attorneys for Claimant.

WILLIAM G. CLARK, Attorney General; ROBERT A. SPRECHER, Special Assistant Attorney General, for Respondent.

388

PERLIN, C. J.

Claimant, Cam-Record Co., Inc., seeks recovery of $25,056.87, allegedly due Cam-Record Co., Inc., from the State of Illinois for material furnished and delivered pursuant to contract.

Clarence J. Reuter, President of claimant company, testified as follows:

He had been in the continuous forms business since 1940 or 1941. In the latter part of 1953 he was consulted by Orville Hodge, the Auditor of Public Accounts of the State of Illinois, in regard to microfilming warrants of the State stored in the Auditor's office. Reuter told Hodge that he had had experience in general office services but not in microfilming. Reuter studied the situation, and claims to have tried to get the microfilming work done on a brokerage basis. After discussion with Hodge, however, Reuter decided to go into the microfilming business himself.

Reuter agreed to microfilm the State warrants under the name Cam-Record Co., not a corporation at that time, and he negotiated a contract with the Auditor's office, dated January 18, 1954, which provided for a price of $2.75 per thousand acceptable warrant images. This contract was to expire on December 31, 1955. The price was set by Reuter and Hodge, but most, if not all, of the other provisions of the contract were negotiated between Reuter and Edward Epping, Hodge's Administrative Assistant.

The terms of the contract identified Cam-Record Co. as the Seller, and the Auditor of Public Accounts of the State of Illinois as the Buyer. It provided that the contract was not transferable or assignable by either party,

and the document was declared to constitute the full understanding between the parties.

Mr. Hodge instructed Reuter that all of the details should be handled with Epping. Epping suggested that a lawyer-friend of his in St. Louis help set up Cam-Record Co. as a corporation, and that Mersinger and Co., of which Epping identified himself as senior partner, keep the books for $250.00 per month. On February 18, 1954, Cam-Record Co. was formed as a Missouri Corporation with an initial capital of $2,000.00 furnished by Reuter, and $500.00 furnished by Epping. Epping then procured the recording of the company's charter in Missouri. A certificate of authority to commence business was issued by the Secretary of State of Missouri on March 10, 1954, and Cam-Record Co., Inc., was licensed to do business as a foreign corporation in Illinois by the Secretary of State of Illinois on May 4, 1954.

After its incorporation, Cam-Record Co. proceeded with the microfilming of warrants for the State. The invoices, upon which the claim herein is based, were rendered, and the services allegedly performed on dates ranging from March 21, 1955 to June 27, 1956.

Reuter was, from the beginning, President of the Cam-Record Co. When Cam-Record Co., Inc., commenced doing business as a corporation, it issued 20 shares of stock, of which 10 were distributed to Reuter, 5 to Henry H. Rickey, Secretary and a Director of Cam-Record Co., and 5 to an employee of Mersinger and Co. named Allen, who was described by Reuter as holding the shares as a "dummy". The stock certificates were held in Epping's office "for safekeeping", including Reuter's certificate for 10 shares. Some months later Epping requested that the certificates be signed over to him in blank. All of the stock certificates were eventually endorsed in blank to

Epping. The total gross business done by Cam-Record Co. during the time of its existence was $220,000.00, of which about $200,000.00 was for the Auditor of Public Accounts. Mr. Epping kept the ledger of Cam-Record Co. in his office, in addition to the accounts receivable and payable. Epping did all of the bookkeeping, and prepared the Cam-Record Co. checks, although he did not sign them. Epping did not have the authority to sign the checks, which were sent over to the Cam-Record Co. office for signature.

No payments were made directly to Edward Epping, other than the fact he was a partner in the Mersinger Company, which received the $250.00 per month. This amount was described by Reuter as being for "so-called services", but the only service rendered was the making of ledger entries. Total payments to Mersinger and Co. by Cam-Record Co. amounted to about $7,500.00.

Reuter did not know the purpose or use intended for many of the checks sent to the Cam-Record Co. office by Epping for signature. Sometimes Mr. Rickey would sign them, and Reuter would not even know they had been signed. In some cases, these checks were payable to cash. Checks handled in this manner amounted to approximately $3,500.00. In regard to these checks, Reuter stated: "They were for nothing. It was pure— pure, what do you want to call it? Another extension of the intimidation and robbery . . ."

Cam-Record Co. also made monthly payments of $150.00 to Adam Sales and Service Company, of which Lloyd E. Lane was owner or president. Lloyd E. Lane was also employed in the Auditor's office. Reuter stated as follows with regard to these payments: "We paid to Adam Sales and Service Company. They did the hauling, and we were not supposed to pay them. Our con-

tract covered the documents being brought to us in good condition, delivered to us, and we were forced to pay the transportation despite the existence of the contract at the time, and the verbal agreement, in addition, that we would not have to pay the hauling, but we did pay the hauling.''

Attorney Robert A. Sprecher testified on behalf of respondent to the effect that an audit revealed that respondent's exhibit No. 9, a Cam-Record Co. check, dated May 24, 1955, in the amount of $1,750.00 payable to Henry H. Rickey, signed by Rickey, endorsed by him in blank, and cashed on May 27, 1955 at the Southmoor Bank, appeared in the ''brown envelope account'', a private account, which Orville Hodge kept at the Southmoor Bank. He further testified that, on May 26, 1954, a check, a State warrant payable to Reuter Business Systems, Multi-Copy Office Forms, in the amount of $549.95 was deposited by Hodge in said ''brown envelope account'', and a total of nine checks of $150.00 each, issued by Cam-Record Co. and payable to Adam Sales and Service, were deposited in Hodge's account between May 26, 1954 and May 27, 1955.

The record shows that the license of Cam-Record Co. to do business as a corporation in Illinois was revoked on November 15, 1957. The complaint in the instant case was filed by Cam-Record Co., A Corporation, as claimant on August 4, 1959. The Missouri Charter of Cam-Record Co. was revoked on January 1, 1959.

Respondent has sought to justify its refusal of payment to claimant on several grounds. Although a number of its contentions appear meritorious, and might well be appropriate basis for this Court's decision, we deem it unnecessary to discuss at length the several defenses advanced by respondent. We consider of primary importance the argument that Edward Epping's dual role

as an owner of claimant company and agent for the State of Illinois nullifies the contract, and renders it unenforceable.

Ill. Rev. Stats., Chap. 127, Par. 75 (1953, 1955), provided:

"No contract shall be let to any person holding any State office in this State or a seat in the General Assembly, or to any person employed in any of the offices of the State government, or the wife of a State officer, member of the General Assembly, or employee as aforesaid, nor shall any State officer, member of the General Assembly, or wife of employee as aforesaid, become, directly or indirectly, interested in any such contract, under penalty of forfeiting such contract, and being fined not exceeding one thousand dollars. 1915, June 22, Laws 1915, p. 671, Sec. 12." (Emphasis supplied.)

Claimant argues that Epping is not within a class forbidden by law to be interested in a State contract, and that, while Epping was Hodge's Administrative Assistant, this was not a position created by law, therefore, Epping was not an "officer." Claimant further argues that Epping was not an employee of the State, because he was not carried on a payroll, but instead the State paid Mersinger and Company $1,000.00 per month, which in turn was paid to Epping.

Respondent has submitted an official report entitled "State of Illinois, Report and Recommendations to Illinois Budgetary Commission with Respect to Investigation on Behalf of the Commission as to the Operations of the Office of Public Accounts of Illinois under Orville E. Hodge", which includes the following statement on pages 26 and 27:

"Hodge and some of his employees and consultants were repeatedly and consciously guilty of serving their personal interests in conflict with and betrayal of their fiduciary responsibilities, and at the expense of the public interest.

. . .

"Edward A. Epping ostensibly served Hodge as a professional accountant consultant. However, he actually served as the Auditor's executive assistant, with authority, direction and control over the Auditor's employees, despite the fact he was neither carried on the payroll as an employee, nor did he

otherwise have a recorded official status. As we have reported elsewhere, he was a partner in the accounting firm of F. M. Mersinger and Company of East St. Louis that was retained by Hodge to do auditing work.

"Payments of $1,000.00 a month were made to F. M. Mersinger and Company for Epping's services. . .

. . .

"Epping was also personally interested in Cam-Record Co., Inc., which entered into an exclusive contract with the Auditor's office to microfilm all State records retained by that office. Cam-Record paid $250.00 per month to F. M. Mersinger and Co. for accounting work allegedly performed by Epping. At one time Epping had in his possession all of the stock of the company endorsed in blank."

Claimant's own witness, Mr. Reuter, testified that Epping approved "almost everything" in the Auditor's office, and would generally approve new systems or forms.

A case in point is *United States* vs. *Mississippi Valley Generating Co.*, 364 U.S. 520 (1961), where the government and the Mississippi Valley Generating Company contracted for the construction and operation of a power plant by the Company. Before the plant was constructed the government cancelled the contract, because the power was no longer needed. The Company sued the government for expenses incurred prior to cancellation.

The Supreme Court held the contract unenforceable due to the activities of Adolphe Wenzell, an officer and director of the First Boston Corporation, a financial institution. He acted as part-time consultant to the Bureau of the Budget at $10.00 per day plus transportation expenses. Although Wenzell took no part in the final negotiations, which led to a formal contract, he did give advice of major importance in the preliminary negotiations. First Boston was subsequently chosen by the sponsors of the project to conduct the major part of the financing.

The Company argued that Wenzell was not an officer or agent of the United States, because "he took no oath of office; he had no tenure; he served without salary, except for $10.00 per day in lieu of subsistence; his duties were merely consultative, were occasional and temporary,

and were not prescribed by statute; and, he was permitted to continue in his position as one of the vice presidents and directors of First Boston Corporation, and to draw his salary from that company."

The Supreme Court held (page 552):

"A key representative of the Government, who has taken no oath of office, who has no tenure, and who receives no salary, is just as likely to subordinate the government's interest to his own, as is a regular, full-time compensated civil servant."

The Court further declared that the sponsors themselves were guilty of no wrongdoing, but the public must be protected from the "corruption, which might lie undetectable beneath the surface of a contract conceived in a tainted transaction." Although the federal conflict of interest statute (18 U.S.C., Sec. 434 ) does not specifically provide for the invalidation of contracts made in violation of it, the Supreme Court held that such contracts are unenforceable, and refused to allow recovery for the loss suffered by the company.

The issue of whether or not Edward Epping as Hodge's Administrative Assistant was a State employee in violation of paragraph 75 also arose in this Court in the recent case of *Fred M. Mersinger* vs. *State of Illinois*, No. 4900. This Court held that Epping was within the class of persons prohibited by statute from being interested in a contract under Chap. 127, Par. 75, as an employee of the State, citing *People* vs. *Epping*, 17 Ill. 2d 557, 162 N.E. 2d 366. In *People* vs. *Epping*, the Illinois Supreme Court affirmed the conviction of Epping for the crime of embezzlement by a public officer, or "any clerk, agent, servant or employee of such officer." At page 370 of that decision, the Court stated that Epping was variously described by witnesses as Hodge's "administrative assistant, or executive assistant, or the right-hand-man of the Auditor."

No matter his title, Epping was unquestionably acting as an agent of the State, and receiving $1,000.00 monthly compensation therefrom, indirectly, if not directly.

The conflict of interest statutes prohibiting public officers and employees from having an interest in contracts are declaratory of the common law, and are designed to protect the public from the evils that would result if public officials were interested in public contracts. The authorities indicate that at common law such contracts were voided on the grounds of public policy to protect the government from being defrauded by its own servants.

It is the opinion of this Court that the contracts upon which this action is based are unenforceable, because of the conflict of interest of Edward Epping, who acted as agent of the State in negotiating and administering the terms of the contracts with a company in which he had a financial interest, amounting at one time to holding all the shares endorsed to him in blank.

The claim of Cam-Record Co., Inc., is hereby denied.