THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* PAT
SAVAIANO, Defendant-Appellant.

(No. 75-100;

Second District (2nd Division)—September 23, 1975.

Kevin P. Connolly, William E. Jegen, and Thomas A. Eckhardt, all of
Glen Ellyn, for appellant.

Stephen J. Culliton, Assistant State's Attorney, of Wheaton (Edward N. Morris and Phyllis J. Perko, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE ALLOY delivered the opinion of the court:

Defendant Pat Savaiano appeals from a conviction in the Du Page County Circuit Court, following a jury trial, of the crime of "Interest in Contracts" (Ill. Rev. Stat. 1971, ch. 102, §§ 3, 4). As a result, defendant Savaiano was sentenced to two years of probation, with the first 90 days to be spent in the county jail. He was also fined the sum of $1,000. The judgment also, following the statute, declared the office held by defendant vacated. As a result of an emergency motion in this court, the portion of the judgment which declared the official position held by defendant vacated was stayed until further order of this court.

On appeal in this court, the issue to be determined is whether Savaiano's conduct fell within the prohibitions of section 3 (ch. 102, § 3) referred to. That provision, which is one of several Illinois laws designed to proscribe self-dealing by public officials, reads, in relevant part, as follows:

"No person holding any office * * * may be in any manner interested, either directly or indirectly, in his own name or in the name of any other person, * * * in any contract or the performance of any work *in the making or letting of which such officer may be called upon to act or vote.* * * *" (Emphasis added.)

A violation of section 3 is made criminal by section 4 (ch. 102, §§ 3, 4). While it is now designated as a Class 4 felony under the Unified Code sentencing structure, the crime of "Interest in Contracts," at the time of the conduct of Savaiano with which we are concerned, was a misdemeanor punishable by a maximum of 5 years' imprisonment and a $1,000 fine and also by vacation of the office.

Factually, the record indicates that Savaiano, while a member of the Du Page County Forest Preserve Commission (hereinafter called "Commission") and while he was chairman of its Finance Committee (also known as the Land Acquisition Committee), had a one-fourth interest in 60 acres of land which the Commission sought to acquire. Defendant chaired Committee meetings during which negotiations were conducted with his cowners. The Committee finally recommended that the land be purchased at a price agreed upon. Before the approval of the purchase by the full Commission, Savaiano sold his interest in the land. Subsequently, the deal was not consummated, and the Commission instead

instituted condemnation proceedings. The indictment in this cause, which was returned by a special grand jury, charged that roughly between August 1, 1972, and December 31, 1972, Savaiano committed the offense of "Interest in Contracts," "in that while he was holding the elected office of a Du Page County Board Member and a member of the Du Page County Forest Preserve Commission, he had an interest as a part owner of real estate in Du Page County, which real estate was the subject of a proposed sales contract * * * with the Forest Preserve District and in the making and letting of said contract as said office holder, the Defendant may have been called upon to act or vote."

During the course of the trial and on appeal in this court, parties have taken contrasting positions as to the scope of section 3, to which we have referred. Defendant contends that there can be no violation of the statute without a completed contract, and that an official must possess the prohibited interest at the very time the contract is completed. The State, on the contrary, argues that the statute extends to proposed contracts, and that it is sufficient for the public officer to own the prohibited interest during active negotiations by the public body, even if the contract is never finally signed and executed. It must, therefore, be determined whether the indictment has charged an offense, under sections 3 and 4 (ch. 102, § 3, 4) referred to, by alleging that the defendant had an interest in a proposed sales contract. We must also determine whether it was proper to charge the jury that it was sufficient if defendant had an interest in *making* a contract rather than in an executed or completed contract itself.

From the record it is shown that Savaiano had been a member of the County Board and the County Forest Preserve Commission for some time and served as chairman of the Commission's Finance Committee (Land Acquisition Committee) for several years prior to the incident we are now considering. From the testimony of the real estate manager of the Commission, it appeared that the Finance Committee's responsibilities included making recommendations to the full Commission on acquiring property, both as to what property should be purchased and what price would be appropriate to be paid. In 1968, the Commission adopted a master plan for acquisition of open space throughout the County, based on a two-year-old plan drawn up by the Northeastern Illinois Planning Commission. This master plan included, as possible property to be acquired, an 80-acre parcel which is involved in the instant case. Twenty acres in the southwest corner of this parcel were owned by three men, Demling, Kuhn, and Accorsi. In December of 1969, these three men and Savaiano each purchased a one-fourth interest in the 20 acres immediately

to the east of the first lot, at a price of $4,000 per acre. Presumably, because of his political position, Savaiano chose an old friend, Bowman, to hold his one-fourth interest as a nominee.

In July 1970, at Demling's request, Savaiano brought the Commission's director and counsel together with Demling to discuss Demling's proposal to donate land to the Commission, with mining rights for gravel remaining in the private owners. In April 1971, defendant and his three coowners purchased the 40-acre tract to the north of the 20-acre lots, at a cost of $4,500 an acre. By September 2, 1971, if not earlier, Savaiano was made aware of Phase III of the Commission's land acquisition plan (implementing the master plan), which included, specifically, the property heretofore described in which Savaiano had an interest. On September 16, 1971, Savaiano himself moved for approval of Phase III by the full Commission and the approval carried.

In March 1972, according to the testimony of Demling, Savaiano mentioned that he wanted to dispose of his interest in the land. Bowman testified that he first became aware of Savaiano's desire to sell his interest sometime in the summer of 1972. In May 1972, Demling consulted with the Commission about its desire to acquire the property and asked that the Commission pay a price of $10,000 an acre. The Commission proceeded by authorizing its real estate manager to secure a quick appraisal of the land. On August 3, 1972, Demling and Accorsi appeared before Savaiano's Committee to negotiate for the sale of the parcel. They renewed their request for a price of $10,000 per acre, but proposed an alternative of $6,000 per acre plus mining rights for 5 years. The Committee, in turn, suggested a price of $5,500 per acre which the owners apparently found unacceptable. All three of Savaiano's coowners came to a Committee meeting on September 14, 1972, at which time a verbal understanding was reached between the three coowners and the Committee that the land would be purchased for $6,750 an acre and that the owners would receive 15¢ per ton in royalties for all gravel mined over the following 20 years. On October 12, 1972, the Committee instructed the Commission counsel to draw up a proposed contract on those terms.

On December 1, 1972, Savaiano sold his interest in the 60 acres to Don Neuses at a price of $6,500 per acre. Eleven days later, on December 12, 1972, the full Commission approved the purchase of the land for $6,750 an acre but without the mining royalties. The sale to the Commission, however, was never consummated, apparently because the final Commission offer did not adhere to the verbal agreement reached between the owners and the Finance Committee in September. Thereafter, the Commission instituted eminent domain proceedings, and it was dur-

ing the process of these proceedings that Savaiano's prior interest in the property was discovered.

The question specifically before this court now is, whether Savaiano's ownership of the land during the negotiations with the Commission for the purchase constituted a violation of section 3 (ch. 102, § 3) referred to. Specifically, we must determine whether the crime of "Interest in Contracts" as defined in section 3 can be committed when, despite extensive negotiations and a tentative understanding between the parties, no contract is ever executed or completed.

From a review of all the facts, and what we determine to be the applicable law, and the appropriate construction of the Act, we conclude that the defendant's conduct in this case was within the spirit and letter of the prohibitory language in section 3 (ch. 102, § 3) and that conviction of Savaiano should be affirmed. It is argued by defendant that there must be a contract or there can be no crime, since the statute prohibits a public official from being interested "in any contract or the performance of any work in the making or letting of which such officer may be called upon to act or vote."

We are aware of the principle of statutory construction being argued that "a criminal or penal statute is to be strictly construed in favor of an accused, and nothing is to be taken by intendment or implication against him beyond the obvious or literal meaning of such statutes." (*People v. Eagle Food Centers, Inc.* (1964), 31 Ill.2d 535, 539, 202 N.E.2d 473; *People v. Isaacs* (1967), 37 Ill.2d 205, 215, 226 N.E.2d 38.) If the statute were construed without further consideration of other principles, the use of the word "contract," in its technical legal sense, would make the existence of a binding contract at law an indispensable element of the offense. We must, however, give consideration to other rules of construction of criminal statutes which are expressed in *Chicago-Crawford Currency Exchange, Inc. v. Thillens, Inc.* (1st Dist. 1964), 48 Ill.App.2d 366, 371, 199 N.E.2d 295, where the court said:

"* * * it is equally true that penal laws are not to be construed so strictly as to defeat the obvious intention of the legislature."

(See also *United States v. Campos-Serrano* (1971), 404 U.S. 293, 298, 30 L.Ed.2d 457, 462, 92 S.Ct. 471; *United States v. Mississippi Valley Generating Co.* (1961), 364 U.S. 520, 550-551, 5 L.Ed.2d 268, 289, 81 S.Ct. 294; *People v. Kirkrand* (1947), 397 Ill. 588, 589-90, 74 N.E.2d 813; *People v. Oliver* (1970), 129 Ill.App.2d 83, 88, 262 N.E.2d 597; *People v. Williams* (3rd Dist. 1969), 116 Ill.App.2d 332, 341, 252 N.E.2d 555.) As we stated recently in *Herrington v. County of Peoria* (3rd Dist. 1973), 11

Ill.App.3d 7, 10, 295 N.E.2d 729, statutes must be construed in such manner as to accomplish the objects sought by their enactment.

██ In construing a statute, whether criminal or otherwise, the primary object is to give effect to the legislative intent. (*People ex rel. Morrison v. Sielaff* (1974), 58 Ill.2d 91, 93, 316 N.E.2d 769; *People v. Scott* (1974), 57 Ill.2d 353, 358, 312 N.E.2d 596; *People ex rel. Hanrahan v. White* (1972), 52 Ill.2d 70, 73, 285 N.E.2d 129.) Where there is no controlling precedent, also, the court may examine the history and circumstances of the legislation (*People ex rel. Hanrahan v. White* (1972), 52 Ill.2d 70, 73). To effectuate the legislative intent, the court may examine not only the language used, but also to the reason and need for the law and the evils to be remedied, as well as the objects and purposes of the Act. *People ex rel. Moss v. Pate* (1964), 30 Ill.2d 271, 273, 195 N.E.2d 641; *People ex rel. Cason v. Ring* (1968), 41 Ill.2d 305, 310, 242 N.E.2d 267; *People v. Isaacs* (1967), 37 Ill.2d 205, 229; *People v. Ikerd* (1963), 26 Ill.2d 573, 578, 188 N.E.2d 12; *Glenview Rural Fire Protection District v. Raymond* (1st Dist. 1974), 19 Ill.App.3d 272, 276, 311 N.E.2d 302; *Peabody v. Sanitary District of Chicago* (1928), 330 Ill. 250, 261, 161 N.E. 519.

The State argues that the language "in the making or letting of which [he] may be called upon to act or vote" shows a legislative intent to make criminal the possession of the prohibited interest during the negotiations. The State contends that the statute, by including this language, sought to prohibit holding an interest during the *making* of the contract. As defendant points out, the language referred to by the State does not explicitly say this, but simply defines the relationship with the contract which the official must have in his public role in order to make his private interest a prohibited one. (*Peabody v. Sanitary District* (1928), 330 Ill. 250, 257, 261.) The defendant contends that even though he was on the Forest Preserve Commission and had an interest in the land the Commission wished to acquire, there would be no violation of the statute if he did not act or vote on the completed contract while holding his public position.

██ We do not believe that the word "contract" as employed in the statute, construed with its other provisions, should be given a narrow technical meaning, but rather, we conclude, it should be construed to include the whole bargaining process which leads up to the completion of a binding contract or agreement with the governmental agency. The reason for such construction is clear. Savaiano had already done all that was required of him to be in violation of the statute, by holding his interest in the land throughout the negotiating sessions. The only missing element, even by defendant's interpretation of the statute, was the final

contract itself. We do not believe it was the legislative intent to provide that the criminality of such conduct would hinge on the sole factor of whether or not the contract actually came into being. This was a decision which was up to the full 25-man Commission. To hold that the nature of the conduct, criminal or legal, is based only on the decision of the Commission to approve, modify or reject the Committee proposal, we believe, would emasculate the statute and frustrate the legislative intent.

Savaiano, as a result of his position on the Finance Committee and on the Commission, could have influenced the decision to buy the land, just as he may have originally purchased the land with an eye to future acquisition by the Forest Preserve District. There is evidence that he participated in Committee meetings as Chairman, while his coowners sat on the other side of the bargaining table. He voted in several instances in relation to acquisition of the land. After he had been in position to boost the value of the land, he then sold out to another private party (and apparently made a profit on the sale, which is irrelevant to the application of the statute). The fact that he acquired the land for between $4,000 and $4,500 an acre and sold it for $6,500 an acre may have been in large part due to his negotiating activity which was used in his position of public trust. The statute clearly sought to make criminal the possession of prohibited interests without considering whether defendant actually profited from the transaction or whether he actually voted or acted on the public contract in his public role. Here in fact, defendant did profit and did vote even though the sales contract eventually fell through.

We do not suggest, however, that the ownership of private property by a public official becomes criminal under section 3 referred to at the mere instant the government proposes to acquire the land. When, however, a defendant holds on to his interest in his property through extensive negotiations until there is a verbal agreement on a purchase price, and where he has presumably done all he could do to violate the spirit and objective of the statute, we believe that the actual existence of a formal legal contract is not an essential element of the crime. Savaiano in this case was in position to know, when he first acquired part of the land in 1969, that the property was on the Forest Preserve's master plan for acquisition of open space. By September of 1971, when he moved for approval of the Phase III acquisition project, he must have known that the land in which he held an interest was specifically included in that project. Yet he sat through the negotiating meetings and did not sell his interest until three months after an understanding was apparently reached between the coowners and his Committee. (While

defendant claims in his brief that an earlier attempt to sell his parcel ended in an aborted closing in late October 1972, there was no testimony to this effect during the trial.) While one does not dispose of an undivided one-fourth interest in 60 acres of land easily or overnight, the evidence does not show anything resembling a diligent attempt by defendant to avoid a conflict of interest by selling the land or revealing his ownership therein.

Defendant relies on *White v. City of Alton* (1893), 149 Ill. 626, to support his argument that a binding contract in a prohibited interest must coincide in time. In that case, the supreme court held it permissible for a city councilman to vote on an ordinance providing for street improvements, and then resign in order to submit a bid as a private contractor. The court found that, since the man had resigned his public office, it was not improper for him to bid on the contract. Aside from the fact that the result in that case is questionable, it is not binding as a precedent and certainly does not express the public policy of the State of Illinois 80 years later. We find *White* distinguishable because the councilman had no private interest at all in the proposed improvements until after he resigned his position.

Defendant also cites two opinions of the Attorney General of this State filed on July 16, 1974 (NP-289, S-787). In each opinion, Attorney General Scott indicates that for a violation of section 3 to occur, there must be a coincidence in time between the possession of the prohibited interest and the making or letting of a contract. It is sufficient for us to say that the "making" of the contract includes the preliminary negotiations, proposals, and authorizations and agreements by the parties—not merely the execution of a final contract. The California Supreme Court has so held in a conflict of interest case in *Stigall v. City of Taft* (1962), 58 Cal.2d 565, 375 P.2d 289, 291, 25 Cal. Rptr. 441.

We believe that the public policy of the State of Illinois (and of our sister States) is clearly to prevent the very sort of double-dealing in which defendant engaged in this case. This policy is reflected in a number of statutes (*e.g.*, Ill. Rev. Stat. 1973, ch. 24, §§ 3—14—4, 4—8—6; ch. 127, § 132.11—1, 2), and we also find this policy reflected in the relatively few cases which have been reported on the subject. A government contract in which a public official has a private interest is uniformly held to be illegal according to statutes, and the common law, and considerations of the highest public policy (*Panozzo v. City of Rockford* (1940), 306 Ill.App. 443, 456, 28 N.E.2d 748; *Koons v. Richardson* (1923), 227 Ill.App. 477, 484; *McCarthy v. City of Bloomington* (1906), 127 Ill.App. 215, 217). Illinois courts have had occasion to construe conflict of interest statutes to prevent evasion of the legislative intent in

prohibiting self-dealing. See, *e.g.*, *Koons v. Richardson* (1923), 227 Ill. App. 477 (contract signed immediately before party became city officer); *School Directors v. Parks* (1877), 85 Ill. 338 ("contracts" includes implied contracts also); *People ex rel. Pearsall v. Sperry* (1924), 314 Ill. 205, 145 N.E. 344 (irrelevant whether interested officers received actual benefits or whether a city made the best deal possible or whether there was no fraud involved); *Peabody v. Sanitary District* (1928), 330 Ill. 250, 161 N.E. 519 (sanitary district treasureship is an office "under the constitution of this State" although not therein enumerated).

The cases referred to indicate a strong public policy against self-dealing by public officials. Since it is not relevant whether the interested officials actually benefit from their wrongdoing, it would seem consistent to say that it is also irrelevant whether the government actually signs a contract based upon the improper conduct which is sought to be proscribed. The title of the Act with which we are concerned (ch. 102, §§ 1—4) also suggests a broad purpose when it is described as "An Act to prevent fraudulent and corrupt practices *in the making or accepting* of official appointments and *contracts* by public officers." (Emphasis added.) See Historical note, Ill. Ann. Stat. ch. 102, § 1 (Smith-Hurd), and, also, *Peabody v. Sanitary District*, 330 Ill. 250, 260.

In speaking of the predecessor to section 11.1 of the Illinois Purchasing Act (Ill. Rev. Stat. 1973, ch. 127, § 132.11—1) which relates to members of the General Assembly, the Illinois Supreme Court said in *People v. Adduci* (1952), 412 Ill. 621, 627, 108 N.E.2d 1:

> "The interest against which the prohibition is leveled is such an interest as prevents or tends to prevent the public official from giving to the public that impartial and faithful service which he is in duty bound to render and which the public has every right to demand and receive."

Defendant Savaiano had such an interest in the case with which we are concerned, during all the negotiations and until the verbal understanding was reached. We believe that the legislature intended to make illegal such an interest, and not to make it dependent upon the ultimate existence of a formal contract. It seems particularly applicable in a sale of property situation, as compared to a service contract, since the interested property owner can use his position to push the price up before selling out to another private party or to the government entity.

Other jurisdictions have come to the same conclusions as outlined in this opinion. As early as 1913, the New Jersey Supreme Court in a conflict of interest case held that "contract" as used in the statute meant a mere agreement (perhaps such as reached in the instant case between the owners and the Committee) instead of a legally binding contract.

(See *State v. Kuehnle* (1913), 85 N.J.L. 220, 88 A. 1085, 1089.) Also, in *State ex rel. Corrigan v. Hensel* (1964), 94 Ohio L. Abs. 449, 30 Ohio Op.2d 377, 198 N.E.2d 84, 87, the Ohio Appellate Court noted the policy of the law is to strictly construe the statutory prohibitions, not in favor of, but against a public office holder having a tangible financial or beneficial interest or personal advantage in matters concerning which he must deal as a public employee. In *Preston v. Gillam* (1962), 104 N.H. 279, 282, 184 A.2d 462, 465, the New Hampshire Supreme Court held:

> "It is a general rule of law, and the law in New Hampshire, that 'there is a conflict of interest when a public officer votes on a matter in which he has a direct personal and pecuniary interest'."

As the Connecticut Supreme Court also stated in *Josephson v. Planning Board* (1964), 151 Conn. 489, 493, 199 A.2d 690, 692:

> "[P]ublic policy requires that members of such public boards cannot be permitted to place themselves in a position in which personal interests may conflict with public duty."

We have noted the older decision of *State v. Feagans* (1897), 148 Ind. 621, 48 N.E. 225, cited by defendant, which might be read to require that a contract actually be in existence, but we do not believe that decision is a precedent which should be followed since there is no language referring to the making or letting of the contract. As we have concluded, the rule of strict construction of penal statutes must, in cases such as we have before us, yield to the cardinal principle of ascertaining and effectuating the legislative intent. (See also *Peabody*, 330 Ill. 250, 261; *United States v. Mississippi Valley Generating Co.* (1961), 364 U.S. 520, 551, 5 L.Ed.2d 268, 289; *Yetman v. Naumann* (1972), 16 Ariz. App. 314, 492 P.2d 1252, 1255; *State v. Hooten* (Fla. App. 1960), 122 So.2d 336, 339.) In the *Hooten* case, the statute involved prohibited an official from being interested in a contract for the construction of a public road or street, a bridge, house or the performance of any other public work. Hooten, like Savaiano, had an interest in land which the County Board wished to acquire. After the sale went through, Hooten was prosecuted but argued that since sale of land was not expressly mentioned in the statute, it could not be judicially written in. The court concluded otherwise and stated (122 So.2d 336, 340):

> "In holding the indictment to be within the purview of the provisions * * * we believe that this conclusion effectuates the object of the statute and serves as a remedy to prevent evil which could arise in the absence of a penal provision. This interpretation is consonant with the legislative intent to preclude a public officer from misuse of the powers of his office for his own profit, to prevent influenced decisions, and to effectuate the ad-

vancement and protection of the public good, which, in the final analysis, constitutes the basic underlying purpose of the statute." We agree with the Florida court and conclude that section 3 (ch. 102, § 3) should be interpreted to include conduct such as engaged in by Savaiano. The success or failure of the official in procuring a government contract involving his unrevealed private interests is not indispensable to the crime of "Interest in Contracts" since the prohibited conduct is the carrying on of negotiations while holding a private interest. It is clear that defendant would have been in violation of section 3 on his own interpretation, if the full Commission had approved the purchase agreement reached in September 1972. The Act proscribes holding an interest during the making of the agreement.

■■ Our construction of section 3 parallels the construction of the court in *Stigall v. City of Taft* (1962), 25 Cal. R. 441, 443, 375 P.2d 289, 291, where the court says:

"* * * we are not here concerned with the technical terms and rules applicable to the making of contracts. The Legislature instead seeks to establish rules governing the conduct of governmental officials. In this sense, is an act done or an agreement "made" only when the final, objective affirmation is communicated? It is true that no rights and duties accrue and no contract is technically made until such time, but the negotiations, discussions, reasoning, planning and give and take which goes beforehand in the making of the decision to commit oneself must all be deemed to be a part of the making of an agreement in the broad sense."

It is notable that in the *Stigall* case the statute referred to a contract "made" while in section 3 we have an even stronger proscription against activities of the public officer in "making" of a contract.

For the reasons stated, the judgment of the Du Page County Circuit Court is affirmed and the order of this court heretofore entered staying the portion of the trial court's order declaring the official position of defendant vacant is now vacated.

Affirmed and stay order vacated.

STENGEL and BARRY, JJ., concur.