**UNITED STATES of America,**
**Plaintiff,**

v.

**Ismael L. ALFONZO–REYES, Vanessa Morales–Hernandez, et al.,**
**Defendants.**

**Criminal No. 03–124(JAG).**

United States District Court,
D. Puerto Rico.

July 29, 2005.

Guillermo A. Gil–Bonar, Lisa Snell–Rivera, United States Attorney's Office, Torre Chardon, San Juan, PR, for Plaintiffs.

Francisco Rebollo–Casalduc, Francisco Rebollo Casalduc Law Office, Jorge L. Arroyo–Alejandro, Jorge L. Arroyo Law Office, San Juan, PR, for Defendants.

## OPINION AND ORDER

GARCIA–GREGORY, District Judge.

Pending before the Court are defendants Ismael Alfonzo–Reyes ("Mr.Alfonzo") and Vanessa Morales–Hernandez's (Mrs. "Morales") Motions for Judgment of Acquittal under Rule 29 (Docket Nos. 748, 749, supplemented by 786, 787, respectively).[1] For the reasons discussed below, the Court **DENIES** the motions for acquittal and sustains the jury verdict.

## I. *FACTUAL AND PROCEDURAL BACKGROUND* [2]

On September 21, 1998, Hurricane Georges passed through Puerto Rico causing significant structural and environmental damages. Shortly thereafter, the President of the United States declared the island a major disaster area, a designation that entitled Puerto Rico to receive millions of dollars through aid programs. Among the agencies administering federal funds was the Farm Service Agency ("FSA"), an agency responsible of providing economic assistance to qualified and eligible farmers, in order for them to return to normal farming operations. Under the FSA program, farmers could qualify for either emergency loans, capped at a maximum of $500,000 per borrower, or operating loans at a maximum of $200,000 per borrower. Farmers could also qualify for monetary awards for indemnity losses which were disbursed through programs such as the Livestock Indemnity Program (LIP) and the Emergency Conservation Program (ECP).

Beginning around September 26, 1998, and continuing up and until about July 2000, a number of farmers and cattlemen, together with FSA employees, engaged in a criminal conspiracy[3] to defraud the United States government through false pretenses and bribery of public officials in the process of approving and disbursing the hurricane-relief funds. The object of the conspiracy was to use the illegally obtained funds for personal purposes.

On April 25, 2003, the Government indicted eight (8) defendants for the commission of the foregoing criminal acts.[4] On June 8, 2004, after a series of procedural events, a jury trial for Ismael Alfonzo and Vanessa Morales commenced. On December 17, 2004, counsel for both defendants filed and argued Motions for Acquittal under Rule 29. (Docket Nos. 748, 749). The Court reserved its decision and submitted the case to the jury. Finally, on December 23, 2004, after almost seven months of trial, the jury returned guilty verdicts against both defendants on the conspiracy count and all substantive counts. On February 10, 2005, the defendants renewed

1. For the sake of judicial efficiency, the Court shall consolidate the motions in one opinion.

2. The relevant information was taken from the general allegations in the indictment. (Docket No. 475).

3. The criminal offense consisted of making false statements or reports, or overvaluing land, property or security in connection with applications for emergency and operating loans and incentive programs.

4. A superseding indictment was filed on April 2, 2004. (Docket No. 475).

their Rule 29 request and filed post-trial supplemental motions for judgment of acquittal. (Docket Nos. 786, 787). Accordingly, the Court shall now decide the motions on the basis of the evidence at the time the ruling was reserved. *See* Fed.R.Crim.P. 29(b).

## II. STANDARD

Fed.R.Crim.P. 29(a) states that a "court on the defendant's . motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Under Rule 29, courts must make a substantive determination on whether the prosecution has failed to carry its burden of proving the elements of the offense beyond a reasonable doubt. *See Smith v. Massachusetts,* — U.S. —, —, 125 S.Ct. 1129, 1136, 160 L.Ed.2d 914 (2005) (holding that even when the jury is the primary fact finder, the trial judge may resolve that the government failed to carry its burden).

The First Circuit has established that when faced with a claim of evidentiary insufficiency, the Court must determine whether the evidence presented, taken in the light most flattering to the prosecution, together with all the reasonable inferences favorable to it, permits a rational jury to find the defendant guilty beyond a reasonable doubt. *United States v. Rivera Rangel,* 396 F.3d 476, 482 (1st Cir.2005); *United States v. Olbres,* 61 F.3d 967, 970 (1st Cir.1995); *see also United States v. Medina–Martinez,* 396 F.3d 1, 5 (1st Cir.2005). Under this formulation, a court considers all evidence, direct and circumstantial, and resolves all evidentiary conflicts in favor of

the government. *United States v. Baldyga,* 233 F.3d 674, 678 (1st Cir.2000). Furthermore, a court "does not need to weigh the credibility of the witnesses or assess whether the government succeeded in eliminating every possible theory consistent with the defendant's innocence." *United States v. Moran,* 312 F.3d 480, 487 (1st Cir.2002); *United States v. Rivera–Ruiz,* 244 F.3d 263, 266 (1st Cir.2001).

## III. DISCUSSION

### 1. *Defendant Ismael Alfonzo's Rule 29 Motion*

In his motion, Mr. Alfonzo challenges the sufficiency of the evidence presented for counts: 2–13, 22, 23–30, 42, 44, 45, 53, 58, 59 and 60. For the sake of clarity, the counts are classified into groups: a) False Statement Counts under 18 U.S.C § 1014 [i)the Toledo loans; ii) the Barreto loans; iii) counts involving incentives]; b)personal interest count under 18 U.S.C § 208(22); c)supplementation counts under 18 U.S.C § 209 (59 and 60). The foregoing are all substantive counts.

### a) *False Statement Counts (2–13, 23–30, 42, 44, 53, 58)*

■ To prove a violation under 18 U.S.C § 1014, the government must prove beyond a reasonable doubt that a defendant 1) did knowingly or willfully, 2) make false statements or reports, overvalue land, property or security, 3) for the purpose of influencing in any way the action of the protected entity (in this case, the Secretary of Agriculture, acting through the Farm Service Agency), 4) in connection with applications for loans or incentives.[5]

---

5. The jury was instructed as to how to determine the intent required to constitute the criminal offense.

1) *"willfully"*—was defined as an act that was committed voluntarily and purposely, with the intent to do something the law forbids. (Jur.Ins. No. 16).

2) *"knowingly"*—was defined as an act that voluntarily and intentionally and not because of mistake or accident. (Jur.Ins. No. 16).

3) *"knowingly"* in the context of a false statement should be found if the defendant knew that it was false or demonstrated a reckless disregard for the truth

Under this provision, a defendant may be convicted of making a false statement only if the government proves beyond a reasonable doubt that the defendant *either knew the statement was false or acted with a conscious purpose to avoid learning the truth.* *United States v. West,* 666 F.2d 16, 19 (2nd Cir.1981).

In his motion, Mr. Alfonzo argues that the United States failed to provide sufficient evidence to satisfy the requisite knowledge *(mens rea* element) as to the false-statement counts charging him with aiding and abetting several cattlemen in the submission of false statements for their loan or incentive applications, all in violation of 18 U.S.C. § 1014. The premise of his theory is that if the government failed to establish his knowledge that information contained in the documents was false, or somehow connect him to the falsification, then the government would be charging Mr. Alfonzo for simply assisting FSA clients in the submission of their applications, an every-day-task for an FSA employee like Mr. Alfonzo.

Naturally, the government contends that the evidence at trial was sufficient for a jury to find, beyond a reasonable doubt, that Mr. Alfonzo either knew that the information was false or he intentionally ignored the false nature of the information, in connection with the loan or incentive applications.

with a conscious purpose to avoid learning the truth. (Jur.Ins. No. 12).
4) *"willful blindness"* as a way of satisfying "knowingly"—should be found if the defendant had closed his eyes to a fact that would otherwise be obvious to him. For example, that the defendant was aware of a high probability of the falsehood of statements, and that he consciously and deliberately avoided learning of that fact. However, mere negligence in failing to learn the fact is not sufficient. (Jur.Ins. No. 17).

*The Government's Liability Theory*

The Government's theory of criminal liability as to the *substantive false statement* counts is premised on principles of accomplice liability, where one who aids and abets a crime is punishable as a principal. *See* 18 U.S.C. § 2.[6]

■ At this juncture, we must distinguish between accomplice and conspiracy liability.[7] Generally, a person is not accomplice to a crime merely because that crime was committed in furtherance of a conspiracy of which he or she is a member, or because that crime was a natural or probable consequence of another offense as to which he or she is accomplice. Wayne R. LaFave, *Criminal Law* 684 (4th ed 2003). That is, although liability as a conspirator and as an accomplice may be based upon essentially the same facts, in order to get a conviction as an accomplice, the government must establish individual culpability as to the underlying offenses. *Id.*

■ Accordingly, to establish accomplice liability *in this case* the government must prove beyond a reasonable doubt that (1) the principal knowingly submitted false statements for the purpose of influencing the Secretary of Agriculture, and that (2) the defendant [accomplice] consciously shared that criminal design, associated himself with it, and actively sought to ensure its success. *United States v.*

6. According to 18 U.S.C. § 2(a), "whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."

7. The defendants were found guilty of participating in the conspiracy to defraud and commit offenses against the Unites States, 18 U.S.C. § 371(Count One). Conviction as to Count One is not challenged here.

Carlos Cruz 352 F.3d 499, 508 (1st Cir. 2003); United States v. Arias, 238 F.3d 1, 4–5 (1st Cir.2001). It is well settled that mere association with the principal, or mere presence at the scene of a crime, even when combined with knowledge that a crime will be committed, is not sufficient to establish aiding and abetting liability. United States v. Luciano–Mosquera, 63 F.3d 1142, 1150 (1st Cir.1995).

■ The First Circuit has recognized that the shared-knowledge element can vary from one aiding and abetting crime to another. United States v. Medina–Roman, 376 F.3d 1,3 (1st Cir.2004); citing United States v. Spinney, 65 F.3d 231, 236–37 (1st Cir.1995)(holding that in criminal prosecution the burden of proving shared-knowledge need not amount to "actual knowledge"). The vital element to be proven is that the aider and abettor shared in the principal's essential criminal intent, which may be inferred from the attendant facts and circumstances. United States v. Campa, 679 F.2d 1006, 1011 (1st Cir.1982).

While we review the sufficiency of the evidence presented as to each count, *we must not forget that jurors are not expected to ignore what is perfectly obvious but, rather, to take advantage of their collective experience and common sense.* Spinney, 65 F.3d at 238.

1) *Counts involving incentives (42, 44, 45, 53 and 58)*

■ *Count 42* charges defendant Mr. Alfonzo with aiding and abetting cattleman Jorge Delgado Perez in the submission of false statements in connection with his emergency loan application of $500,000. Mr. Alfonzo moves for acquittal on this count alleging that the testimony of Jorge Delgado does not connect him to the false statements made on the application for the emergency loan. The Court does not agree.

Jorge Delgado's testimony [8] reveals that he was present at the meeting held at Fernando Toledo's house, where he met defendants Ismael Alfonzo and Vanessa Morales for the first time and where he learned that they were offering their help with FSA incentive or loan applications. That their service would cost 4% of the money received(Direct Testimony at 3–4) and that he established a friendly relationship with defendant Mr. Alfonzo inasmuch he sometimes socialized with the defendant and other cattlemen in bars and restaurants in the Arecibo/Hatillo area(Direct Testimony at 8).

Regarding the loan application concerning Count 42, Mr. Delgado testified that he submitted false information about the amount of actual damages caused by Hurricane Georges. He also testified that defendants Ismael Alfonzo and Vanessa Morales, as well as Jorge Ramirez and Mr. Grau (the FSA contractor who processed his loan), all had knowledge that he was submitting false information in his loan application (Counsel Arroyo's Cross Examination at 123). Mr. Delgado further testified that Ismael Alfonzo, Vanessa Morales and Mr. Grau told him to inflate the number of dead cows for his loan application, and that they all knew that this information was false because he dealt with the three of them throughout the process (Counsel Rebollo's Cross Examination at 42–43).

After reviewing Jorge Delgado's testimony, and taking the evidence aforementioned in the light most favorable to the government, this Court finds that a reasonable jury could conclude beyond a reasonable doubt that Mr. Alfonzo is guilty of Count 42.

**8.** Mr. Jorge Delgado testified before this Court on October 28, 2004.

*Counts 44 and 58* charges Mr. Alfonzo with aiding and abetting Nelson Ramos Irizarry in the submission of a false statement in connection with LIP and ECP incentives applications. Specifically, Nelson Ramos reported to FSA that he had lost 117 cows and 33 heifers as a consequence of Hurricane Georges, knowing this information was false. Mr. Alfonzo moves for acquittal on this count alleging that Nelson Ramos' testimony did not place him playing a role in the submission of false information. The Court does not agree.

On October 19, 2004, Nelson Ramos testified before this Court that he was present at the meeting held at Fernando Toledo's house, and that he learned that Ismael Alfonzo and Vanessa Morales could expedite the loan processing by charging a 4% commission on the total amount of the loan (Direct Testimony at 11–18). He also testified that Mrs. Morales handed in blank applications (Direct Testimony at 21) and told the farmers that in order to obtain the loan they had to reach a total of $500,000 or more in damages (Direct Testimony at 22).

Mr. Ramos further testified that on September 17, 1999, Mr. Alfonzo gave him some applications to get additional incentives (LIP and ECP) for dead cows, and that this occurred without Mr. Ramos asking for those documents (Direct Testimony at 63). Also, that Mr. Alfonzo asked him to obtain a letter from a veterinarian certifying the number of dead cows in his farm in order to receive the additional incentives (Direct Testimony at 71). Mr. Ramos acknowledged that he supplied false numbers in this application. (Direct Testimony at 74).

Mr. Ramos added that after receiving his first check, he was told by fellow cattlemen that Mr. Alfonzo's advice was for them to write a letter to FSA and request the agency to increase the amount (Direct Testimony at 60). That he did submit a letter and FSA increased the amount of the incentive check from "around $5,000 to $14,000–something," without him submitting additional information (Direct Testimony at 67 –70).

Mr. Ramos also testified that subsequent to receiving his loans and incentives, Mr. Alfonzo cited him to Iván Rosa's[9] house because supposedly there were some documents that had not been signed yet (Direct Testimony at 80), and that Mr. Alfonzo was worried because of an audit being conducted at FSA (Direct Testimony at 81). That Mr. Alfonzo continually explained to him that those funds (the FSA funds) were quotas that were established for the states and that if not used, they would be lost. Furthermore, when the prosecution asked Mr. Ramos why he believed Mr. Alfonzo was telling him that, he answered that, he "[did] not know why, but I believe that at that moment he understood that he was helping us" (Direct Testimony at 83).

Finally, Mr. Ramos testified that he socialized with Mr. Alfonzo in the Arecibo/Hatillo area (El Rincón Criollo, El Buen Café, Chili's), and that at other times he saw him socializing with Ismael Delgado, Teodoro Alfonzo–Toledo, Iván Rosa, "Renecito" Delgado and Jorge Delgado (Direct Testimony at 83). He stated that during those reunions they socialized and "talked about the industry" (Direct Testimony at 84).

After reviewing Nelson Ramos' testimony, and taking the evidence in the light most favorable to the government, the Court finds that a reasonable jury could conclude beyond a reasonable doubt that Mr. Alfonzo is guilty of Counts 44 and 58.

---

**9.** Mr. Rosa was the farmers' representative at FSA's Board of Directors. (Direct at 80).

*Count 45* charges Ismael L. Alfonzo with aiding and abetting Luis Delgado in the submission of false statements in connection with an application and/or certification for free livestock indemnity monies. Mr. Alfonzo moves for acquittal on this count arguing that Luis Delgado's testimony did not place Mr. Alfonzo playing a role in the submission of false information. The Court disagrees.

Luis Delgado's testimony [10] reveals that he was also present at the meeting held at Fernando Toledo's house (Direct Testimony, October 21, at 94). There he learned that Ismael Alfonzo and Vanessa Morales were offering to process their FSA incentive or loan applications, and that their service would cost 4% of the money received (Direct Testimony, October 21, at 98). That he applied for incentives through the agency and was approved for $2,000, but that after submitting various false invoices through Ismael Alfonzo, he ended up receiving $14,000 (Direct Testimony, October 25, at 32). He further testified that he, along with other farmers, got together and agreed to make a donation to Mr. Alfonzo "in appreciation for all he had done for [them]". (Direct Testimony at 35). That he, along with Teodoro Alfonzo–Toledo, Ismael Delgado, and Jorge Delgado, went to Ismael Alfonzo's office and gave him the money ($10,000) in a paper bag, and then Mr. Alfonzo took the money, put it in his jacket and took it to his truck (Direct Testimony, October 25, at 35–36).

After reviewing Luis R. Delgado's testimony, and taking the evidence in the light most favorable to the government, the Court finds that a reasonable jury could conclude beyond a reasonable doubt that Mr. Alfonzo is guilty of Count 45.

*Count 53* charges the defendant Ismael L. Alfonso with aiding and abetting cattleman Teodoro Alfonzo–Toledo in the submission of false statements in connection with an application for free emergency conservation monies in the amount of $19,200.00. Mr. Alfonzo moves for acquittal on this count alleging that Teodoro Alfonzo–Toledo's testimony did not place Mr. Alfonzo playing a role in the submission of false information. The Court disagrees.

Teodoro Alfonzo–Toledo's testimony [11] reveals that he was also present at the meeting held at Fernando Toledo's house, where he learned that Ismael Alfonzo and Vanessa Morales were offering to expedite FSA incentive or loan applications, and that their service would cost him 4% of the money received (Direct Testimony at 8–9). He then testified that he stepped out of the meeting because he was not interested in what was being discussed. More specifically, that he was not interested in paying around $11,000 for the "expedite process" 4% of the $275,000 loan he had requested when he only had to pay around $535 applying directly through FSA (Direct Testimony at 12–22).

Mr. Alfonzo–Toledo further stated that after the meeting, he arranged to meet with Ismael Alfonzo on various occasions (El Buen Café, El Rincón Criollo, Mr. Mofongo and Fernando Toledo's house) and that they socialized and talked about agriculture and the opportunities for farmers through the agency (FSA). That Mr. Alfonzo told him that there was more money available for fences and debris removal and that he proceeded to submit new invoices to FSA in order to request additional aid.(Direct Testimony at 22). That he thinks that Alfonzo must have had knowledge that the new invoices were false for

---

**10.** Luis R. Delgado testified before this Court on October 21 and 25, 2004.

**11.** Teodoro Alfonzo–Toledo testified before this Court on November 4, 2004.

two reasons: 1) he had already submitted invoices for a given period and had not submitted anything else since; and 2) Mr. Alfonzo implied to him that if he brought an invoice for heavy machinery he would get more money (Direct Testimony at 32).

Mr. Alfonzo–Toledo also testified that he and four other farmers collected money for Mr. Alfonzo, with the purpose of alleviating some losses he had suffered in his farms after the passage of Hurricane Lenny through the southern part of Puerto Rico in 1999. The four other farmers were identified by Mr. Alfonzo–Toledo as Iván Rosa, Pedro Vélez, Jorge Lucena and Gustavo Toledo, and they each contributed with $1,000 in cash and handed the money to Mr. Alfonzo at the parking lot of FSA's Arecibo offices (Direct Testimony at 51–52). Mr. Alfonzo–Toledo explained that he personally went with the group to deliver the money to Mr. Alfonzo so the latter could see he was part of the group who collected the money (Direct Testimony at 54). When the prosecution asked why would he want Mr. Alfonzo to know that, Mr. Alfonzo–Toledo replied: "[w]ell, perhaps he could help me with an incentive" (Direct Testimony at 54).

After reviewing Mr. Teodoro Alfonzo–Toledo's testimony, and taking the evidence in the light most favorable to the government, the Court finds that a reasonable jury could conclude beyond a reasonable doubt that Mr. Alfonzo is guilty of Count 53.

*Counts 23–30* charge Ismael Alfonzo with aiding and abetting the Barreto family members in the submission of false statements in connection with their request for emergency and operating loans. Mr. Alfonzo moves for acquittal on this count alleging that the evidence is insuffi-cient to support a conviction that he knew the information submitted by the Barreto family members was false. The Court does not agree.

Juan Manuel Barreto Ginorio's testimony[12] reveals that although he did not attend the meeting held at Mr. Fernando Toledo's house, he did learn through other means what was discussed there, namely, that Ismael Alfonzo and Vanessa Morales were helping farmers expedite their emergency loans and incentives applications for a 4% commission of the total amount received (Direct Testimony at 16). That such information led him to seek their assistance to fill out his FSA loan application (Direct Testimony at 17), and that he went with that purpose to attorney Frenchy Irizarry's office with Glorimar, Juan Félix, Ramón Luis and Juan I. Barreto (Direct Testimony at 16).

Mr. Barreto Ginorio further testified that there he was assisted by Vanessa Morales, who completed his application and filled the total amount of damages suffered by him and told him to get the corresponding estimates in order to process his application (Direct Testimony at 39–40). That he later received a call from FSA telling him he needed to change his application from personal to corporate (Direct Testimony at 65). Finally, that he knew that Ismael Alfonzo was the loan manager at FSA at that time, and that he was married to Vanessa Morales (Direct Testimony at 65–66).

Mrs. Glorimar Barreto testified[13] that several months after completing the application at Frenchy Irizarry's office, she was asked to go to FSA to sign some papers for the emergency loans. That there she met with Mr. Alfonzo, who was very ner-

---

**12.** Juan M. Barreto Ginorio's testimony was heard before this Court on August 30, 2004.

**13.** Mrs. Glorimar Barreto's testimony was herd before this Court on September 1 and 2, 2004.

vous and concerned about some missing documents in the Barretos' application (Direct Testimony, September 2, at 18–19). At that time she also knew that he was married to Vanessa Morales (Direct Testimony, September 2, at 19).

Juan I. Barreto and Juan Félix Barreto Ginorio [14] also testified that their loan applications were completed by Vanessa Morales (Direct Testimony, September 7, at 57). That she would write down a number in their application and tell them to go get the estimates (Direct Testimony, September 7, at 61).

After reviewing the Barreto family member testimonies, and taking the evidence in the light most favorable to the government, the Court finds that a reasonable jury could conclude beyond a reasonable doubt that Mr. Alfonzo is guilty of counts 23–30.

*Counts 2–13* charge Ismael Alfonzo with aiding and abetting the Toledo family members in the submission of false statements in connection with their emergency and operating loans application. Mr. Alfonzo moves for acquittal on this count arguing that Mr. José Piñero Vázquez testimony did not serve to meet the government's burden of proving criminal knowledge against Mr. Alfonzo.[15] The Court disagrees.

Mr. Piñero's testimony [16] reveals that he was employed by Mr. Pedro Toledo Fernández and Mr. Gregorio Toledo Fernández in September 1998. That he was an employee of the Toledo family businesses since 1980 (Gregorio Toledo Inc., Café Dairy, Marina Dairy and PTF, Inc.), (Direct Testimony at 68–69), and that his duties there encompassed bookkeeping, accounting, administration, invoicing and performing purchases (Direct Testimony, August 3, at 83).

He further testified that the day after the hurricane, Mr. Fernando Toledo called him and directed him to go by the dairy farms to check the damages, if any, and to have the administrator do damage check and report on it (Direct Testimony, August 3, at 90). That Mr. Fernando Toledo instructed him to go to FSA and get four (4) loan applications. (Direct Testimony, August 3, at 99). That he did not fill any of those applications, but that later Mr. Toledo claimed $500,000 in each of them (Direct Testimony, August 3, at 110). That he was also instructed by Mr. Fernando Toledo to hand in the completed applications to Vanessa Morales at attorney Frenchy Irizarry's office (Direct Testimony, August 4, at 16). That he signed the loan applications as president of Gregorio Toledo, Inc., and that Mr. Alfonzo signed the applications and other closing documents for FSA (Direct Testimony, August 4, at 88). That he knows Mr. Ismael Alfonzo both from the FSA and from an activity that was held at a farm owned by Pedro Toledo Fernández (Direct Testimony, August 4, at 19).

He also testified that other documents related to the FSA loans(letters, mortgage papers, checks) were signed by Mr. Alfonzo, Mr. Fernando Toledo and/or Frenchy Irizarry (Direct Testimony, August 4, at 27, 30, 97 and 137).

After reviewing Mr. José Piñero's testimony, in conjunction with the prior testi-

---

**14.** Juan I. Barreto Ginorio testified before this Court on September 7 and 8, 2004. Juan F. Barreto Ginorio testified on September 13, 2004.

**15.** Since none of the Toledo family members were witnesses in the case, the government

chose to meet its burden of proof through the testimony of Mr. Piñero Vázquez, an employee of the Toledo family.

**16.** José Piñero Vázquez's testimony was heard before this Court on August 3, 4, 19, 23 and 24, 2004.

monies that put Mr. Alfonzo in the meeting held at Fernando Toledo's house, and taking the evidence in the light most favorable to the government, the Court finds that a reasonable jury could conclude beyond a reasonable doubt that Mr. Alfonzo is guilty of counts 2–13.

### 2) Personal Interest Count (22)

■ *Count 22* charges Ismael Alfonzo with participating in the evaluation and approval of the loan application filed by Angel Ramón Alvarez with FSA for a $500,000 emergency loan, in which Mr. Alfonzo had a financial interest. Specifically, this count charges Mr. Alfonzo of obtaining a personal loan from Mr. Alvarez Rodriguez for $100,000, which derived from a loan Mr. Alvarez Rodriguez obtained from Banco Santander with the support of a letter from Mr. Alfonzo—in his official capacity as Farm Loan Manager— asking the bank to advance Mr. Alvarez Rodriguez $100,000 because his FSA emergency loan had been approved and would be used to repay the Banco Santander loan.

This charge is brought under 18 U.S.C. § 208, which provides that "whoever, being an officer or employee of . . . the United States Government . . . participates personally and substantially as a Government officer or employee, through decision, approval, disapproval, recommendation, the rendering of advise, investigation, or otherwise . . . in a matter in which, to his knowledge, he has a financial interest" is guilty of a criminal offense. The purpose of this section is to insure honesty in government's business dealings by preventing federal agents from advancing their own interests at the expense of public welfare. *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961).

Mr. Alfonzo moves for acquittal arguing that a review of the transcript of Mr. Alvarez Rodriguez' testimony shows that Mr. Alfonzo did not participate in the processing of the emergency loan request of $500,000 that Mr. Alvarez Rodriguez filed. The Court disagrees.

Mr. Álvarez's testimony [17] reveals that he knew Ismael Alfonzo since they were both college students at the University of Puerto Rico–Mayaguez. That he applied for FSA loans after Hurricane Georges passed through Puerto Rico, and that Mr. Alfonzo assisted him in that process (Direct Testimony at 55). That while he was waiting for the FSA loan application to be disbursed, Mr. Alfonzo advised him to go to Banco Santander, Yauco Branch, where he could obtain a loan with a letter of approval from FSA (Direct Testimony at 54–55). That he acted accordingly and requested a loan for $150,000 (Direct Testimony at 61).

Mr. Alvarez further testified that Mr. Alfonzo approached him and explained that he had financial problems, and asked Mr. Alvarez to lend him $100,000 (Direct Testimony at 62). That Mr. Alfonzo told him that the Banco Santander loan could be extended to $250,000 with a letter from him stating that the emergency loan with FSA had been approved (Direct Testimony at 64). Mr. Alvarez told the Court that he did get the letter from Mr. Alfonzo and got the $250,000 loan from Banco Santander (Direct Testimony at 69). Also, that he lent the $100,000 to Mr. Alfonzo through a check which Mr. Alfonzo directed him to make payable to Mr. Ignacio Pintado (Direct Testimony at 75).

When the prosecution asked how he was hoping to pay the Banco Santander loan, he replied that "with the money Mr. Alfonzo would return to me, with the money my

**17.** Ángel R. Álvarez testified before this Court on December 10, 2004

business would generate, and with the money of the emergency loan for my farm" (Direct Testimony at 73). Mr. Alvarez also testified that he knew Fernando Toledo, José Torres and Vanessa Morales (Direct Testimony at 100–104).

After reviewing Mr. Angel Alvarez's testimony, and taking the evidence in the light most favorable to the government, the Court finds that a reasonable jury could conclude beyond a reasonable doubt that Mr. Alfonzo is guilty of count 22.

### 3) *Supplementation Counts (59, 60)*

*Counts 59 and 60* charge Ismael Alfonzo with receiving from a source other than the Government of the United States, a supplementation of his salary as compensation for his service as the Farm Loan Manager for the FSA in Arecibo. Specifically, count 59 charges Mr. Alfonzo with receiving a payment of approximately $10,000 in cash, from several cattlemen who were client/customers of the FSA in Arecibo, Puerto Rico. Whereas count 60 charges Mr. Alfonzo with receiving the payment for the body repair of an Izuzu Trooper belonging to his wife, Vanessa Morales Hernandez, from cattlemen who were clients/customers of the FSA in Arecibo, Puerto Rico.

The counts are brought under 18 U.S.C. § 209, which essentially provides that any officer or employee of the executive branch of the United States Government, or of any independent agency of the United States, shall not receive any salary or anything of monetary value from a private source as compensation for his services to the Government.

Mr. Alfonzo argues, analogizing to 18 U.S.C. § 201(b)(1)(A), that the government's evidence in this case failed to connect the improper payments charged in counts 59 and 60 to *a specific official act,*

and hence that he should be acquitted of such counts. The Court disagrees.

The Court finds that the prosecution produced enough evidence for a reasonable jury to convict the defendant Mr. Alfonzo. For instance, see Mr. Luis R. Delgado's testimony, discussed in connection with count 53, and Mr. Teodoro Alfonzo–Toledo's testimony in connection with count 45, both of whom charged that Mr. Alfonzo accepted a gift of around $10,000 from various cattlemen of the Arecibo/Hatillo region.

Furthermore, Pedro Vélez's testimony [18] reveals that he went with other cattlemen to Ismael Alfonzo's house to return him a vehicle, an Izuzu Trooper, that had just been repaired (Direct Testimony at 49). Mr. Vélez further testified that the repair was paid by Ismael Delgado and himself, and that Mr. Alfonzo accepted it and, indeed, was very thankful (Direct Testimony at 55).

Mr. Vélez also testified that he participated in a collection of $10,000 among various cattlemen with the purpose of giving it to Mr. Alfonzo. Among those who participated in the gift were Iván Rosa, Ismael Delgado, Teodoro Alfonzo–Toledo and Jorge Delgado (Direct Testimony at 61). That Ismael Alfonzo took the money at the FSA office in Arecibo and took it to his truck (Direct Testimony at 71–72). He (Mr. Vélez) declared that he originally was against the gift because he thought that it might look bad; that is, that it could look as if was made because of the favors Alfonzo had made to them (Direct Testimony at 73).

He concluded stating that Ismael Alfonzo knew that the information he provided for his applications was false (Cross–Examination at 54).

---

**18.** Pedro Vélez' testimony was heard before this Court on December 1, 2004.

After reviewing Pedro Vélez's testimony, in conjunction with the prior testimonies of Luis R. Delgado and Teodoro Alfonzo–Toledo, and taking the evidence in the light most favorable to the government, the Court finds that a reasonable jury could conclude beyond a reasonable doubt that Mr. Alfonzo is guilty of count 22.

### 2. Defendant Vanessa Morales' Rule 29 Motion

█ Mrs. Vanessa Morales challenges the sufficiency of the evidence presented for count 20, which charges her with bribing a public official in violation of 18 U.S.C. § 201(b)(1)(A)(B)(C) and (2). Specifically, Mrs. Morales is charged with aiding and abetting Mr. Ismael L. Alfonzo in directly or indirectly offering approximately $130,000, and actually giving $18,000 in cash to José Torres Correa with the intent to influence and induce him to aid in committing a fraud on the United States by approving and authorizing for disbursement unqualified loans to cattlemen in the Arecibo region of Puerto Rico, in violation of his lawful duty as the Farms Program Chief of the FSA.

Mrs. Morales argues that Mr. Torres Correa's testimony did not incriminate her in the least and that, on the contrary, exculpated her. Moreover, that the record is devoid of any evidence to support this charge. The Court disagrees.

José Torres' testimony [19] reveals that he pleaded guilty to receiving bribes for approving illegal loans (Direct Testimony, July 1, at 86). That the arrangement he entered into with Ismael Alfonzo would entail Mr. Torres approving various illegal loans for one percent of the total amount approved (Direct Testimony, July 1, at 115). That the agreement was to the effect that "as soon as the cases were closed, the clients paid the attorney [Frenchy Irizarry], the attorney was going to pay Vanessa Morales[,] and after Vanessa Morales deducted the amount of interest and payment for income tax," Mr. Torres was going to receive his share (Direct Testimony, July 13, at 95).

Specifically, Mr. Torres testified that Mr. Ismael Alfonzo promised him $130,000 ($50,000 to cancel a previous debt with Mr. Alfonzo and $80,000 for himself) (Direct, July 13, at 104). That Mr. Alfonzo told him that he was going "to obtain it from his wife" [Vanessa Morales] and that "they were going to get it out of the bank little by little" (Direct, July 13, at 105).

Mr. Torres further testified that he ended up receiving only $18,000 in three installments of $6,000 in cash (Direct Testimony, July 14, at 4). That when he complained to Mr. Alfonzo about the remaining balance, he replied that it "was a slow process while his wife [Vanessa Morales] collected, deposited and took the money out cash." (Direct, July 14, 2004 at 31).

After reviewing Mr. José Torres's testimony, and taking the evidence in the light most favorable to the government, the Court finds that a reasonable jury could conclude beyond a reasonable doubt that Mrs. Morales is guilty of count 22.

### CONCLUSION

In light of the foregoing, this Court hereby **DENIES** the defendants' Motion for Judgment of Acquittal under Rule 29 of the Federal Rules of Criminal Procedure (Docket Nos. 748, 749, supplemented by 786, 787, respectively), and sustains the jury verdict rendered on December 23, 2004.

IT IS SO ORDERED.

---

19. José Torres' testimony was heard before this Court on July 1, 13, 14 and 15, 2004.